## DOWNS *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 318. Argued October 29, 1902.—Decided January 5, 1903.

When a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process or in whatever manner or under whatever name it is disguised, it is a bounty upon exportation. As under the laws and regulations of Russia, the Russian exporter of

sugar obtains from his government a certificate solely because of such exportation, which certificate is salable and has an actual value in the open market, the government of Russia does secure to the exporter from that country, as the inevitable result of such action, a money reward or gratuity whenever he exports sugar from Russia, and which is in effect a bounty upon the export of sugar which subjects such sugar, upon its importation into the United States, to an additional duty equal to the entire amount of such bounty under the act of Congress of July 24, 1897, 30 Stat. 205.

THIS was a writ of certiorari to review a decree of the Circuit Court of Appeals, affirming a decree of the Circuit Court for the District of Maryland, which itself affirmed the action of the board of general appraisers, holding a cargo of refined sugar imported into Baltimore from Russia subject to a countervailing duty leviable upon merchandise upon which a bounty is paid upon exportation.

The proceedings were instituted by a petition filed in the Circuit Court setting up the importation of sugar on the steamship Assyria, July 6, 1899, the imposition of a countervailing duty by the collector of customs at Baltimore, and the payment of the same under protest; and the fact that the decision of the collector had been affirmed by the board of general appraisers. The grounds stated in the petition for a review are, generally, that the country from which the sugar was exported did not pay or bestow, directly or indirectly, any bounty or grant upon the exportation of said sugar.

The return of the general appraisers contained a copy of the proceedings before them, including a copy of the Russian law and regulations, a stipulation of facts, a copy of certain reports from the United States consul at Odessa, and their opinion overruling the protest, and affirming the decision of the collector. The Circuit Court affirmed the action of the general appraisers, and upon appeal to the Circuit Court of Appeals that court in turn affirmed the decree of the Circuit Court. 113 Fed. Rep. 144.

*Mr. Ernest A. Bigelow* on behalf of petitioner supported the contention that no bounty or grant was paid or bestowed by the Russian government upon the exportation of the consign-

ment of sugar involved in the action. The Russian sugar law is not a covert scheme to pay concealed bounties on exportation, but the genuine effort of a paternalistic government to wrest the control of the trade from a pernicious sugar ring and to regulate the industry in the interest of producer and consumer alike.

Section five of the tariff act of 1897 (in full in opinion, p. 501 *post*), applies only to bounties on exportation and is distinguished from bounties on production. *Allen* v. *Smith*, 173 U. S. 402. By specifying only bounties upon exportation, Congress must have intended to *exclude* bounties on production from the operation of section five, and unless the bounty alleged to be paid by the Russian government be conditioned solely on exportation, and in such fashion that the exporter gets it and the non-exporter does not, unless, in other words, the exporter is placed in a better position than if he had not exported, then the bounty is not a true bounty on exportation, and section five can have no application thereto. The purchase price of the "free sugar" export certificate is not a bounty on exportation; and merely liquidating the value of the right cannot convert that into a bounty on exportation which was not one before. The enhanced prices secured to manufacturers by the operation of a high protective tariff constitute a virtual bounty on *production*. Alexander Hamilton's Report on Manufactures; *United States* v. *Realty Co.*, 136 U. S. 427, 434; *Colder* v. *Henderson*, 54 Fed. Rep. 802, 803; Lord Pirbright, P. C., Prest. of Sugar Conference of 1888, in Empire Review for April, 1902, p. 264. The question is not whether protective duties are indirect bounties, but whether Congress intended to include them within the scope of section five, and it is plain that Congress could not have had any such intention. The action of the Russian government in further limiting the market to a portion only of the product distinguishes the system in degree, but not in principle, from the American system. The wording of the section excludes the theory that Congress intended to include therein the "virtual bounties" resulting from the operation of protective tariffs or other artificial limitations of the home market.

The Russian law does not, either directly or indirectly, re-

quire the manufacturer to export any portion of his sugar as a condition precedent to selling the balance in the home market, but on the contrary invites him not to do so but to carry over his surplus into the next campaign. This disposes of all arguments based on a supposed obligation to export in order to obtain the benefit of the artificially high prices in the home market. The Brussels Sugar Conference decided, not that Russia paid a bounty on exportation, but that the artificially high prices ensured on the home market by the high protective tariff acted as virtual bounties on production, enabling the manufacturer to endure losses abroad. If such conclusions are to be adopted the United States is the greatest bounty paying country in the world. Congress never intended the words "bounty or grant" as used in section five to have any such extreme application. The remission of excise taxes on the exportation of sugar is not a bounty or grant on exportation as the terms are used in section five. If the question is one in doubt, the doubt must be resolved in favor of the importer "as duties are never imposed on citizens upon vague or doubtful interpretation." *Hartranft* v. *Wiegmann,* 121 U. S. 609, 616; *Adams* v. *Bancroft,* 3 Sumner, 38.

*Mr. Assistant Attorney General Hoyt,* for the United States, respondent.

The single question involved is whether a bounty was bestowed by Russia on the exportation of the sugar. The point of jurisdiction which might be urged in favor of exclusive executive authority to determine the question appears to have been waived by the Secretary of the Treasury having voluntarily submitted the matter to the judicial determination of the Board of General Appraisers and the courts. The only other case under this law is *Hills* v. *United States,* 99 Fed. Rep. 425; on appeal, 107 Fed. Rep. 107, which decided that the practical effect of the Dutch law is to make the remission of the Excise Tax from the standpoint of other countries a bounty on exportation.

The Russian government desires to maintain prices, and therefore limits the output on the domestic market. It also

desires to stimulate production, and for this purpose puts a premium on exportation. It is neither necessary nor proper to suggest a covert purpose to bestow a bounty by seeking a covert method; but the Russian attitude offers some excuse for such a suggestion. It is enough to establish that the premium on exportation, the indirect bounty, is the necessary effect and re-sult of the scheme. The grant as a governmental allowance is shown by the complete control of the government over it. The government reserves the right to suspend the remission of excise in order to guard against the effect of such a rise of prices in the rest of Europe as might cause an abnormal do-mestic over-production. One highly significant feature in the arrangement is the cession or transfer of free sugar from one mill to another in order to facilitate exportation, which trans-fer carries a consideration to the producer who cedes his home market right, and constitutes the concrete evidence of the pre-mium or indirect bounty on exportation. *Hartranft* v. *Wieg-mann*, 121 U. S. 609, distinguished, but see *Henderson* v. *The Mayor*, 92 U. S. 259, 268, as to the doctrine of reasonable in-terpretation. This court does not accept a foreign remission of internal tax as conclusive upon its effect with respect to our own laws. *United States* v. *Passavant*, 169 U. S. 16. The Russian scheme carried out under their sugar law and regula-tions clearly amounts to the paying or bestowing indirectly of a bounty or grant upon the exportation of sugar which prop-erly subjects the merchandise upon importation into this country to the countervailing duty presented by section five of the tariff act of 1897.

Mr. Justice Brown, after making the foregoing statement, delivered the opinion of the court.

This case involves the single question whether, under the laws and regulations of Russia, a bounty is allowed upon the export of sugar which subjects such sugar, upon its importa-tion into the United States, to an additional duty equal to the entire amount of such bounty; under the act of Congress of July 24, 1897, 30 Stat. 205, which reads as follows:

"Sec. 5. That whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties."

A bounty is defined by Webster as "a premium offered or given to induce men to enlist into the public service; or to encourage any branch of industry, as husbandry or manufactures." And by Bouvier, as "an additional benefit conferred upon or a compensation paid to a class of persons." In a conference of representatives of the principal European powers, specially convened at Brussels in 1898 for the purpose of considering the question of sugar bounties, the definition of bounty was examined by the conference sitting in committee, who made the following report:

"The conference, while reserving the question of mitigations and provisional disposition that may be authorized, if need be by reason of exceptional situations, is of opinion that bounties whose abolition is desirable, are understood to be all the advantages conceded to manufacturers and refiners by the fiscal legislation of the States, and that, directly or indirectly, are borne by the public treasury."

"There should be classified as such, *notably:*

"(*a*). The direct advantages granted in case of **exportation.**

" (*b*) The direct advantages granted to production.

" (*c*) The total or partial exemptions from taxation granted to a portion of the manufactured products.

" (*d*) The indirect advantages growing out of surplus or allowance in manufacturing effected beyond the legal estimates.

" (*e*) The profit that may be derived from an excessive drawback.

" In addition, the conference is of opinion that advantages similar to those resulting from the bounties hereinbefore defined may be derived from the disproportion between the rate of customs duties and that of consumption dues (surtaxes), especially when the public powers impose, incite or encourage combinations among sugar producers.

" It would be desirable to regulate surtaxes in such manner as to confine their operation to the protection of home markets."

A bounty may be direct, as where a certain amount is paid upon the production or exportation of particular articles, of which the act of Congress of 1890, allowing a bounty upon the production of sugar, and Rev. Stat. sections 3015–3027, allowing a drawback upon certain articles exported, are examples; or indirect, by the remission of taxes upon the exportation of articles which are subjected to a tax when sold or consumed in the country of their production, of which our laws, permitting distillers of spirits to export the same without payment of an internal revenue tax or other burden, is an example. *United States* v. *Passavant*, 169 U. S. 16.

The laws of Russia, regulating the production and exportation of sugar, are very complicated, not easily understood, and too long to justify their full incorporation in this opinion. Such, however, as bear upon the question of bounty are reproduced from a translation of the Russian law of November 20, 1895, and regulations thereunder, the accuracy of which is stipulated by the parties, together with certain statements also stipulated to be read as evidence.

The objects of the Russian law are stated in the words of a recent note delivered to the representatives of the powers at St. Petersburg, as follows: " The Russian government only

regulates the distribution of sugar on its home market, its purpose being, on the one hand, to antagonize over-production of sugar, and on the other, gradually to bring about lower prices and greater consumption for that product in this country. It protects home consumption against rises in the prices, and production against sudden and considerable falls." Counsel for petitioner insists that the chief object of the government is to prevent, or at least to discourage, over-production with its attendant evils, and, to accomplish this, the law penalizes over-production by imposing thereon double the regular excise tax.

From the stipulation of facts it appears that at the opening of each sugar campaign a committee of ministers, upon a report of the Minister of Finance—

"(1.) Estimates the total consumption and the total production of sugar, and the total amount which may be put upon the market at the normal excise of one and three fourths roubles (a current rouble being equal to about fifty-one cents) per pood (of thirty-six pounds) is definitely fixed at the total amount required for consumption." (This excise amounts to about two and a half cents per pound.) "This is known as free sugar."

"(2.) The first sixty thousand poods produced by each factory is free sugar. The balance of the production is divided into free sugar, obligatory reserve and free surplus or free reserve."

"(3.) The amount of free sugar in each factory is proportioned to its total production, as the estimated consumption is to the total production of the country. This percentage is fixed by the government according to the estimates of production and consumption."

For instance, if the ministers estimate the home consumption at thirty-five million poods, and the probable production at fifty million poods, 35–50 of the daily production of each factory will be set apart as "free sugar" by the inspector, and 15–50 (less a certain portion of "indivertible reserve") will be set apart as surplus.

"(4.) Under the Russian law therefore all sugar is divided into the three following classes:

" *a.* 'Free sugar,' which consists of a certain quantity of sugar which the Russian government permits a factory or re- finery to sell for home consumption under an excise tax of 1.75 roubles per pood."

" *b.* An 'obligatory or indivertible reserve' of sugar, which consists of a certain quantity kept at each factory or refinery by order of the government and which may not be sold or re- moved without the special permission of the government."

The object of this reserve is to enable the Minister of Finance, in case the price in the home market exceeds the price fixed as a maximum, to authorize the issue of sugar from this reserve upon payment of the usual tax in quantities sufficient to bring about a reduction in prices.

" *c.* 'Free reserve or free surplus,' which consists of sugar as is manufactured over and above the quantity of 'free sugar' and 'obligatory or indivertible reserve.' This sugar cannot be sold for home consumption except upon payment of the regular tax of 1.75 roubles and an additional tax of 1.75 roubles, or 3.50 roubles in all."

The Russian government also fixes and determines (*a*) the total quantity of sugar required for home consumption from all the factories and refineries, that is, free sugar; (*b*) the quan- tity of sugar to be kept by each factory as an obligatory re- serve; (*c*) the maximum of prices during the prevalence whereof such reserve must remain intact in the factories, as well as the conditions under which the sugar in reserve can be put on the market.

2. The quantity of sugar produced in excess of the amount for home consumption (free sugar) is considered as an excess of production, and when sold is subject to a double tax.

3. This excess is distributed among the factories in propor- tion to the quantity of sugar produced by each of them over and above sixty thousand poods.

4. The obligatory reserve of sugar to be kept by each factory is derived and completed from the quantity of sugar in excess of the normal quantity, by taking from such excess the neces- sary percentage to constitute the prescribed reserve.

5. Sugar in excess of the normal production cannot be put

on the home market otherwise than upon payment of an additional tax, the normal tax being payable according to the general regulation. However, it is allowed to the manufacturers to keep this excess of sugar as free reserve, and in such case, so long as the sugar does not leave the factory, they are not required to pay either the additional or regular excise.

6. The sugar in the obligatory reserve is not liable to the payment of tax until it is withdrawn by permission under the conditions indicated in section 7.

"7. In cases where the prices in the home market exceed the normal prices fixed, the Minister of Finance authorizes the issuance of sugar from the obligatory reserve and from the free reserve (if necessary) in sufficient quantities to cause a decrease of price without payment of the additional tax, but with payment of the normal excise."

"8. In case of loss without the fault of the manufacturer, of sugar comprised in the obligatory or free reserve, the Minister of Finance is authorized to strike the lost sugar from the factory's account, without exacting the excise and additional tax charged against it."

"9. Upon the exportation from the factories of the excess of sugar the same is exempted from the excise and additional tax in full measure."

For the purpose of insuring to the domestic manufucturer a profitable home market the Russian government imposes a duty of three roubles per pood (practically prohibitive) upon imported sugar. Upon the other hand, and to insure to the consumer a reasonable price, it fixes a maximum price, during the prevalence of which the obligatory reserve must remain intact. This reserve is set aside from the production of each mill, so that when the prices in the home market rise beyond the maximum fixed, the Minister of Finance authorizes the sale of sugar from the obligatory reserve, and from the free reserve if necessary, in sufficient quantities to reduce the price, upon payment only of the normal excise. The amount of free sugar to which each factory is entitled is determined by the ministry upon the basis of the probable national consumption and the probable production, the product of every factory be-

ing divided according to the ratio between these estimates. Each manufacturer can sell his quota of free sugar upon the home market upon the payment of the normal excise of 1.75 roubles per pood. He can only place his surplus upon the home market by paying a double excise ; but he may leave it in the mill where it is not subject to the tax; or he may have it transferred to the production account of the next campaign, where it will serve him to increase the amount on which his percentage of free sugar is estimated ; or he may export it free from excise. The last alternative is the one usually adopted.

It frequently happens, however, that a manufacturer located near a seaport town is unable to find a market for his free sugar at home, but by a remission of the excise may export his sugar to some foreign country at a profit, while the manufacturer in an interior town may be able to dispose of a much larger amount of "free sugar" than he is entitled to put upon the market, but is located too far from the seaboard to export at a profit. As the government is interested only in the amount of free sugar produced, and not in the particular person producing it—the allotment to each factory being merely to do equal justice to all—it permits the seaboard manufacturer to export his free sugar without tax, and to assign his right to the interior manufacturer to sell as much additional free sugar as is represented by the amount exported or convert his " surplus " into " free sugar," thus saving the additional tax.

The method by which this assignment is effected is shown by the following regulations of the government " on transfers of free sugar from one mill to another in order to facilitate the exportation of the surpluses to foreign countries " :

" SEC. 39. A manufacturer may cede to another manufacturer his right to place on the home market free, i. e., without the payment of an additional tax, his alloted quota of sugar.

" SEC. 40. In relation to such cession the following rules may be observed :

" (1.) The manufacturer who assigns to another manufacturer his right to dispose of a certain quantity of sugar free must give notice thereof to the local excise board, which first orders to be held at the mill a quantity of free sugar equal to that

about to be assigned, and immediately thereupon duly communicates with the excise board having jurisdiction of the mill in whose favor the assignment is being made.

"(2.) If the assignment is accepted by the latter mill, the quantity of free sugar in said mill is correspondingly increased by transfer from the free surplus (not from the indivertible reserve), of which a memorandum is made by the excise officers in charge; thereupon the excise board, from which the communication in relation to the assignment of free sugar has been received, is notified of the acceptance of said assignment.

"(3.) Upon receipt of the notification that the assignment has actually been accepted, the quantity of ' free sugar' at the factory by which the assignment has been made is correspondingly reduced by transferring the same into the free surplus (or free reserve), of which a memorandum is made by the excise officer in charge.

"(4.) The reduction of the quantity of free sugar at one mill and the increase thereof by assignment at another mill are entered in the proper books of the mill."

It thus appears that, by a series of book entries carried on under the direction of the local excise board having jurisdiction of the mill of the assignor, and the corresponding board having jurisdiction over the mill of the assignee, and without any actual transfer of sugar from one mill to the other, or the issue of a certificate, the "surplus" sugar of the assignee manufacturer is converted into "free sugar," which he can sell at the normal excise, and the "free sugar" of the assignor manufacturer has become "surplus," which he can place on the home market by paying the double tax, (practically prohibitory) leave in the mill where it is not subject to the tax, have transferred to the production account of the next year, or export to a foreign country.

Should the assignor manufacturer deem it best to adopt the last alternative of exporting, he will obtain in a foreign market a price somewhat less than he would have obtained had he sold his sugar as free in the local market. Hence, the consideration which the interior manufacturer must pay to induce the other to transfer his rights to free sugar to him, is measured by the

difference between the home market price and that prevailing
in the foreign market. With regard to this, we quote from the
report of the American consul appearing in the record :

"As the first and second methods of disposing of his sugar
(by selling under the double tax or exporting) are less advan-
tageous than placing the article on the home market as free
sugar, the manufacturer who ceded his right received from the
manufacturer who acquired the right the price per pood agreed
upon between them, which is usually determined by the differ-
ences existing at the moment between the price obtainable for
the sugar on the home market and the price obtainable by sale
abroad. This is what is termed a *transfer*. Dependent upon
the fluctuations in the price of sand sugar in Russia and abroad,
the price for these transfers also varies; therefore, the person
who sells or transfers the right of issue in the home market,
charges several copecks more than the difference mentioned
above. This is done on account of the risk that is taken that
sugar prices abroad may fall, and also for the trouble involved in
exporting, etc. Example : The price of sand sugar at a station
in the southwestern region (*a*) for the home market, Rs. 4.25
per pood, or without excise, Rs. 2.50 ; (*b*) for abroad, Rs. 1.25.
Consequently the difference of value of transfer is Rs. 1.25 ;
but in that case, for the reasons given, Rs. 1.28 to 1.30 is paid
for the transfer."

While it is true that this transfer of the right of issuing free
sugar does not involve as a condition thereto the export of any
sugar whatever, the only condition being that the assignor's
free sugar shall diminish *pari passu* with the increase of the
assignee's, yet, as a matter of practice, the object of making
such transfer appears to be to increase the amount which the
assignor *may* export, although he may, as a matter of fact,
find it more profitable to leave his surplus in the mill to be
transferred to the production account of the following year.
If his factory be located far inland, he will be likely to do this,
while if he be near a seaport town, he will probably prefer to
export his surplus, even at the lower prices obtainable abroad.

Provision is made for the manner of exporting sugar to for-
eign countries by the following regulations, the first of which

(section 37) applies to free sugar, and the second of which (section 38) applies to the free surplus:

" I.—*On the Manner of Exporting Sugar to Foreign Countries.*

" Sec. 37. *Free sugar*, exempt from the additional tax, may be exported to foreign countries in compliance with the rules heretofore existing; the exportation of such sugar requires, however, a permit from the excise office, which must be duly endorsed on the bill of lading, as set forth in sections 31 and 34 of these instructions.

" Note.—The mill owner is allowed to export free sugar (this rule does not apply to purchased sand or refined sugar produced from purchased sands) on account of his surplus for the same campaign. For this purpose the export is made in the manner hereinafter, in subdivisions 1 to 4 of section 38, set forth, except that the excise office notes on the certificate 'free sugar,' and requires no security for the *additional* tax. Upon the return of the certificate with the custom-house export mark, the excise office credits the exported quantity of sugar to the free surplus of the mill, if such there be, and increases by a like quantity the allowance of free sugar, of which a memorandum and an entry in the book must be made.

" Sec. 38. In relation to exports of the *free surplus* (free reserve) of sugar from the mills, the following special order must be observed, in addition to the rules now in force.

" (1) The transport of sugar from the *free reserves* intended for export to foreign countries must be shipped in the presence of the excise authorities, who, after examining the transport, endorse on the bill of lading accompanying the same that said sugar has been removed from the free reserve for exportation abroad, and issue a separate certificate to the mill owner, setting forth the name of the mill, the bill of lading accompanying the transportation, and the statement of the weight of the sugar contained therein.

" (2) The *additional tax*, at the rate of roubles 1.75 per pood, chargeable to the exported sugar, must first be secured in full by *cash*, excise credit vouchers, or such funds as are accepted as security for the tobacco excise, or by the stock of sugar, free

or of the free reserve, on hand in the factory, as set forth in section 30 of these instructions. (The 75 kopeck portion of the excise due on exported sugar is to be paid or secured in accordance with the rules now in force.)

"(3) The custom-house duly examines the exported shipment of the free surplus, the tare previously certified by the excise office being accepted at its actual weight as per bill of lading annexed to the export certificate. After forwarding the transport across the border, the custom-house delivers to the shipper, in lieu of refunding the *excise*, (not the *additional* tax, however,) a voucher crediting the same on his sugar excise account, and marks down by endorsement on the certificate of the excise office presented by him (subdivision 1) the time of export, the net weight of the exported sugar, and the credit voucher issued stating the amount of excise allowed.

"(4) The certificate with the endorsement of the custom-house must be returned by the mill owner to the excise office within six months from the date the sugar was shipped from the mill, whereupon the *additional* tax charged upon the exported sugar is remitted by the excise office, by a corresponding credit in proportion to the quantity of sugar exported, and the deposits securing the same are released. If the certificate is not returned within said time, or does not account for the full quantity of sugar which was to have been exported, then, upon the failure of the mill owner to pay within two weeks the additional tax due, the excise office must proceed with the collection thereof in regular manner."

It thus appears that free sugar, which may be sold in Russia, at the normal excise of R. 1.75 per pood, may be exported under a permit from the excise office, and upon the return of the free sugar certificate with the custom-house export mark, the excise office credits the exported quantity of sugar to the free surplus of the mill. With the free surplus, however, which is subject not only to the normal excise of R. 1.75 per pood, but to an additional tax of the same amount, a somewhat different course is pursued. The *additional* tax chargeable to the exported sugar must first be secured in full cash or its equivalent, and an export certificate delivered, which must be returned by the

mill owner to the excise office within six months, whereupon. the additional tax is remitted by the excise office by a corresponding credit in proportion to the quantity of sugar exported. For the *normal* excise, a voucher crediting the same on the sugar excise account is delivered, as in the case of free sugar.

The following facts were stipulated :

" 5. That the sugar which was imported in this case, and which is covered by this protest, consists of free sugar as above defined, and would have been subject to an excise tax of 1.75 roubles per pood if sold in Russia."

" 6. That upon the exportation of said sugar from Russia the Russian government, under its laws and regulations, released said sugar from said tax of 1.75 roubles either by a refund of the tax or a cancellation of the indebtedness, or otherwise."

" 7. That in addition to remitting said excise tax the government issued to the exporter a certificate certifying that he had exported such a quantity of so-called free sugar ; that the said certificates have a substantial market value, and are transferable, and that the price thereof is usually determined by the difference existing at the time between the price obtainable for sugar on the home market and price abroad."

8. That said certificates are sold to and used by sugar manufacturers or refiners, who are thereby enabled to transfer from their " free reserve," or " free surplus," to their " free sugar " an amount of sugar equal to the amount shown by said certificates to have been exported, which amount may then be sold for domestic consumption on paying the ordinary tax of 1.75 roubles per pood (to which free sugar is regularly subject) instead of a tax of 3.50 roubles per pood.

This appears to be the real function of the free sugar export certificate—to obtain a transfer of sugar from " surplus" to " free sugar " account. This free sugar export certificate being negotiable, any holder of the same is at liberty to call for the transfer of a like amount of sugar from surplus to free sugar account, and is thereby enabled to put his sugar upon the market at the normal excise instead of the double tax imposed upon surplus.

By this arrangement neither the total amount of free sugar allowed to the two manufacturers nor the total export has been increased, since what the assignor exports the assignee sells as free sugar. The assignee, however, has secured the large profits of the sale of his sugar at home and saved his freight to the coast, while on the other hand the seaport merchant has sacrificed those profits by exporting his sugar at a less remunerative price. It follows that the price which the seaport manufacturer receives for his export certificate is the difference between what he would have received had he sold his free sugar at home and the price he would have obtained on the foreign market. For instance, if the price in the home market is R. 2.50 per pood, and in the foreign market R. 1.25, the certificate will be worth the difference between these two, and the exporter will receive the same gross amount as if he had not exported his free sugar, but had sold in the home market. Thus:

By sale at home he obtains the market price..... R. 2.50
By sale abroad he obtains the foreign market
    price................................R. 1.25
Also the price of certificate..............R. 1.25
                         R. 2.50

In practice, of course, as in the case of all commodities, the market value of these certificates must vary according to the demand and supply, but the theory underlying the transaction is always this, that the exporter shall suffer no loss because he has exported his free sugar instead of selling it in the home market.

It is practically admitted in this case that a bounty equal to the value of these certificates is paid by the Russian government, and the main argument of the petitioner is addressed to the proposition that this bounty is paid, not upon exportation, but upon production. The answer to this is that every bounty upon exportation must, to a certain extent, operate as a bounty upon production, since nothing can be exported which is not produced, and hence a bounty upon exportation, by creating a foreign demand, stimulates an increased production to the ex-

tent of such demand. Conversely, a bounty upon production operates to a certain extent as a bounty upon exportation, since it opens to the manufacturer a foreign market for his merchandise produced in excess of the demand at home. A protective tariff is the most familiar instance of this, since it enables the manufacturer to export the surplus for which there is no demand at home. If there were no tariff at all, and the expense of producing a certain article at home were materially greater than the expense of producing the same article abroad, there would be none produced, and, of course, none to export. But with the aid of such tariff production would be stimulated, and might become so much greater than the home demand, that a manufacturer would look to foreign markets for his surplus. In the case of Russian sugar the effect of the import duties is much enhanced by the fact that, the supply of free sugar from the home market being limited, the selling price is very remunerative, and each producer has therefore an interest in placing as much sugar as he can on the home market; and as the total amount of free sugar is distributed among all the manufactories in proportion to their entire production, it may become to their interest to export their surplus even at a loss, if such loss can be compensated by the profits on sugar sold in the home market. This would not make the tariff a bounty upon exportation, but a mere incident to its operation upon production. But, if a preference be given to merchandise exported over that sold in the home market, by the remission of an excise tax, the effect would be the same as if all such merchandise were taxed, and a drawback repaid to the manufacturer upon so much as he exported. If the additional bounty paid by Russia upon exported sugar were the result of a high protective tariff upon foreign sugar, and a further enhancement of prices by a limitation of the amount of free sugar put upon the market, we should regard the effect of such regulations as being simply a bounty upon production, although it might incidentally and remotely foster an increased exportation of sugar; but where in addition to that these regulations exempt sugar exported from excise taxation altogether, we think it clearly falls within the definition of an indirect bounty upon exportation.

The argument of the petitioner in this connection is that, if a manufacturer sell his free sugar on the home market, he receives the home market price of, say, R. 2.50 per pood; whereas if he export his "free sugar," he receives the foreign price, say, R. 1.25 and R. 1.25, the price of his export certificate. "In other words, by exporting his 'free sugar' and selling his export certificate, the exporter receives exactly the same amount he would have received had he sold his 'free sugar' on the home market. All producers'fare equally well before the law. Those who sell at home receive the high prices insured on the home market, while those who export what is the equivalent thereto: —the foreign market price plus the price of the export certificate. Hence there is no bounty on exportation, for the reward of the manufacturer is not conditioned on exportation, nor is it greater than it would have been had he not exported. Bounty on production this reward may be, but certainly not bounty on exportation, for it is a contradiction in terms to call that a bounty on exportation which is received in one form or another by all manufacturers alike, whether they export or do not export."

It is true that when a manufacturer exports free sugar for account of surplus, and thereby avoids the necessity of giving security for the additional tax, he obtains an export certificate which he may use to obtain the transfer of an equal amount of "surplus" sugar to "free sugar" account. This right of issue of free sugar into the home market at the normal tax he transfers when he sells his export certificate. The certificate, however, none the less represents a bounty upon exportation, although it *may* be used for the purpose of obtaining a transfer of a certain amount of surplus sugar to the free sugar account for the home market.

But the fact that he receives the same amount, whether the goods are exported or sold at home, is not the proper test whether a bounty is paid upon exportation. If no bounty at all were paid all sugar, or at least all "free sugar," would pay the same tax, whether sold at home or exported abroad; and in this case the free sugar upon which the tax is remitted when exported would go abroad burdened with an excise tax of R. 1.75

per pood, which would prevent the manufacturer from selling it at such a price abroad as would enable him to realize a profit. The amount he receives for his export certificate, say, R. 1.25, is the exact amount of the bounty he receives upon exportation, and this enables him to sell at a profit in a foreign market. All manufacturers would prefer to sell at home if they could realize a greater price than by selling abroad, but if by being paid a drawback, or by a remission of taxes, they can find a profitable market in a foreign country, so much sugar as is not needed at home will be sent abroad.

The details of this elaborate procedure for the production, sale, taxation and exportation of Russian sugar are of much less importance than the two facts which appear clearly through this maze of regulations, viz.: that no sugar is permitted to be sold in Russia that does not pay an excise tax of R. 1.75 per pood, and that sugar exported pays no tax at all. The mere imposition of an import duty of three roubles per pood, paid upon foreign sugar, is, like all protective duties, a bounty, but is a bounty upon production and not upon exportation. When a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name it is disguised, it is a bounty upon exportation.

The difference in price between Russian sugar sold at home and abroad is thus shown by the delegate of Austria-Hungary at the Sugar Conference of 1898 by the following quotations from the Odessa exchange under date of June 10, 1898:

|  | Francs per 100 kilos. | Cents per pound. |
|---|---|---|
| For Russia: 5.8 rubles per pood, say............ | 82.70 | 7.25 |
| For export: 1.73 rubles per pood, say........... | 28.16 | 2.47 |
| Hence a difference: 3.35 rubles per pood, say..... | 54.54 | 4.78 |
| Deducting the tax: 1.75 rubles per pood, say..... | 28.49 | 2.50 |
| There remains a discrepancy of 1.60 per pood, say | 26.05 | 2.28 |

" The same merchandise, on the same date, and at the same place, thus commanded a different price according to its des-

tination, and the difference amounted to 26.05 francs per 100 kilos (2.28 cents per pound).

"If we are to investigate the reasons which may impel Russian manufacturers to produce more sugar than is needed for home consumption, and to bring the surplus for exportation down to a comparatively much lower price, we shall find the explanation of this strange phenomenon in the legislative system of Russia. Such is our intimate conviction."

The object of issuing certificates of sugar exported seems to have been merely to enable the exporting manufacturer to obtain the best price for the privilege he assigns to the interior manufacturer of putting an equal amount of free sugar upon the market by assigning the certificates to the one who would offer the best price. In this connection the Circuit Court of Appeals found : "That the Russian exporter of sugar obtained from his government a certificate, solely because of such exportation, which is worth in the open market of that country from R. 1.25 to R. 1.64 per pood, or from 1.8 to 2.35 cents per pound. Therefore we hold that the government of Russia does secure to the exporter of that country, as the inevitable result of its action, a money reward or gratuity whenever he exports sugar from Russia." We all concur in this expression of opinion.

The decree of the Circuit Court of Appeals is, therefore,

*Affirmed.*