## F. W. WOOLWORTH CO. v. UNITED STATES.

### Customs Appeal No. 4297.

Court of Customs and Patent Appeals.

Nov. 8, 1940.

Sharretts & Hillis, of New York City (Edward P. Sharretts, of New York City, of counsel), for appellant.

Charles D. Lawrence, Acting Asst. Atty. Gen. (Joseph F. Donohue, Sp. Atty., of New York City, of counsel), for the United States.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This case reaches us by appeal from the judgment of the United States Customs Court Third Division, overruling appellant's protest whereby recovery is sought of the sum of $461.41 assessed and collected as countervailing duty under the provisions of section 303 of the Tariff Act

of 1930, 19 U.S.C.A. § 1303, upon certain merchandise consisting of china novelties in the form of china tableware ordered by appellant from a manufacturer in Germany on or about March 17, 1936, paid for in July 1936, and imported through the port of New York where it was entered August 12, 1936.

The section reads:

"Sec. 303 [§ 1303]. *Countervailing duties*

"Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this Act [chapter], then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act [chapter], an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties."

■ Another case involving countervailing duty is that of V. Mueller & Co. v. United States, 115 F.2d 354, 28 C.C.P.A., Customs, ——, concurrently decided, but the instant case presents an issue not there presented, while omitting issues which were there involved. In that case it was not disputed that a state of facts existed which might have resulted in the payment or bestowal in Germany of a bounty or grant upon the merchandise there involved

but the contention was confined to questions of law relating to the validity and sufficiency of T. D. 48360 (69 Treas.Dec. 1008), hereinafter quoted, and related matters, discussion of which may be found in our decision of the case. In the instant case counsel for appellant conceded during the oral argument before us that the assignments of error do not cover the questions of law which were there presented. Consequently, we are not now called upon to consider those matters. However, a reading of our opinion there in conjunction with this decision may be found desirable.

To state the situation in slightly different language, it may be said that in the Mueller & Co. case, supra, the importer, without challenging the primary fact that a bounty or grant, within the purview of section 303 of the 1930 Tariff Act, was being paid or bestowed upon the merchandise there involved, centered its attack upon the sufficiency and validity of T. D. 48360, and tendered no evidence relative to the state of facts which brought about the issuance of the T. D. In the instant case appellant, evidently accepting the T. D. as being prima facie valid and proceeding upon the theory that the alleged bounty or grant declared by the Secretary of the Treasury to have been paid or bestowed, resulted from a situation existing in Germany respecting German currency and trade practice, assumed the burden of proving the facts relative to such currency values and trade practices. The facts are not in dispute, and the issue is whether those facts show a condition or transaction in which a bounty or grant was paid or bestowed directly or indirectly upon the export from Germany of the merchandise involved.

The brief on behalf of appellant under the heading "The history of the Registered Reichsmark," recites as a background certain historical facts, summarized from the Encyclopaedia Britannica and other authorities, relative to German currency, with occasional references to our own currency, immediately prior to the World War (1914–1918) and subsequent thereto up to and including much of 1936. This we do not quote in full but a paraphrase of parts of it (its substantial accuracy being agreed to by counsel for the Government), it is thought, will aid in elucidating the opinion.

Prior to 1914 the unit of German currency was the reichsmark, commonly called the "mark". Its value was one-tenth of

an imperial gold coin (kronecrown), 139½ of which could be coined from a pound of pure gold. The standard gold coin in circulation in Germany at that time was a ten-mark piece (1 crown). During that same period the standard gold dollar (the standard unit of value) in circulation in the United States contained 25⁹⁄₁₀ grains of gold, 9¹⁄₁₀ fine, 31 U.S.C.A. §§ 314, 315,, and the value of the gold in the German gold mark in terms of United States money, as determined by the Director of the United States Mint, was $.238. T. D. 33056, 24 Treas. Dec. 1.

During the years following 1918, economic conditions in Germany became chaotic in the extreme; there was a period of currency inflation brought about by the issuance of paper currency in such quantities that the value of the gold mark in terms of paper currency, as measured by the exchanges in countries having the gold standard, progressively depreciated until in November 1923, when a crisis was reached, its (the gold mark's) value was "a million million" paper marks. In 1923 an effort was begun to stabilize German currency. The effort took the form of loans with a fixed value based on gold, commodities, mortgages, savings bank deposits, commercial contracts and the like. What was called the "Rentenbank" was created and the currency "was concentrated into the so-called 'Rentenmark' on the basis of 1 Rentenmark = 1 billion paper marks = 1 gold mark." In 1924 the plan familiarly known as the "Dawes Plan" (so called from the name of the chairman of the committee composed of citizens of the United States —Honorable Charles G. Dawes) was put into operation. This plan, among other things, made provision for loans from other countries, or their citizens, by which Germany was supplied with 800,000,000 gold marks, the United States share of such loan being $110,000,000. In addition to this loaned amount other investments were made so that, according to an estimate made by the United States Department of Commerce, at the end of 1930 United States loans and investments in Germany aggregated $1,420,957,000. By reason of the loans and investments Germany was able gradually to retire the Rentenmark notes, and the gold standard was proclaimed with the reichsmark having the same gold equivalent as the pre-war gold mark, fixed as the currency unit. Germany's money reparation obligations, so far as she met them, were paid largely out of the loans which were received under the "Dawes Plan." The loans from the United States were made in the main by private banking institutions. For a time subsequent to 1924 foreign exchange was available without limitation in exchange for Reichsbank notes, which was equivalent to the redemption of such notes in gold.

However, due to various economic, labor, and political conditions, together with her foreign obligations, Germany was gradually drained of gold until financial catastrophe again threatened. As a result there came about what is known as the Seven Power Conference which met in London, England, in 1931 and entered into an agreement whereby banking creditors in countries foreign to Germany maintained short-term banking credits to that country. That agreement was renewed in 1932 and finally, in 1933, "The German Credit Agreement of 1933," generally referred to as the "Standstill Agreement," was made between, or among, commercial, industrial and banking (including the Reichsbank and the Deutsche Golddiskontbank) concerns in Germany and committees representative of banking institutions in the countries foreign to Germany, the interested banks of the United States participating.

The desirability of keeping the price of the reichsmark (German currency unit) "up" and stable doubtless was recognized and the "Standstill Agreement," a copy of which is in evidence in the case, was made for the purpose, among others, of assuring to Germany the maintenance of the short-term banking credits extended as a result of the agreement entered into at the 1931 Seven Power Conference, and renewed in 1932.

It is sufficient for the purposes of this case to state, without a minute recital of details, that the foreign creditors of Germany from time to time received payments in reichsmarks in liquidation of the credits which they had extended and by the terms of the "Standstill Agreement" such reichsmarks were placed in the hands, or under the control, of the Reichsbank as trustee to be held for the account of such creditor, the reichsmarks so dealt with being registered in the name of the creditor institution. These are referred to in the record as "Registered marks" and constituted one class of so-called controlled (that is controlled by the German Government) marks. These could not be withdrawn from Germany (no class of marks could be) but it

was permitted the creditor to deposit such registered marks in designated German banks and use them in Germany for such purposes and to such extent as the Reichsbank (which is described by appellant's witness, Mr. A. Q. Smith of the Woolworth Company, as a government agency—"a Federal bank") might approve, and the creditor-owner, of course, was at liberty to sell the reichsmarks which it received in the open market in countries other than Germany at whatever price the creditor-owner was willing to accept.

The Chase National Bank of New York City was one of the creditors in the United States and it received a large sum of these registered marks as payments upon the indebtedness due it, taking them, as we understand the testimony of one of appellant's witnesses (Mr. Alfred W. Barth of the Chase National Bank), at the exchange rate of $.4033 per mark, which was the value fixed by the Exchange Control Board in Germany following the devaluation of the United States gold dollar on January 31, 1934. See footnote to 31 U.S.C.A. § 821. Some of the reichsmarks so received by it were on deposit, or credited to its account in the Deutsche Bank in Germany. It offered such reichsmarks for sale in the United States and during the month of January 1936 appellant purchased 800,000 of them. The purchases were made on different dates at different exchange rates, ranging from $.2120 per reichsmark to $.2150+. The aggregate (expressed in terms of United States currency) paid for the 800,000 reichsmarks was $171,380.

The reichsmarks so purchased by appellant were transferred to its account in the Deutsche Bank of Germany upon the request, or at the direction, of the seller, the Chase National Bank, and registered in appellant's name.

The purpose of Woolworth & Company in purchasing the marks was stated by Mr. Smith to have been to "apply them against" some of the merchandise which the company expected to buy in Germany for export to the United States stores and such application was made.

It appears that when the foreign (to Germany) owner of registered reichsmarks desired to use them in the purchase of merchandise in Germany for exportation to other countries, it was necessary to secure a permit from the Reichsbank, and for the purpose of controlling such reichsmarks the Reichsbank formed an organization or corporation, called the Treuhand-Gesellschaft, which passed upon the issuance of the permits. The Reichsbank had also an organization styled the Reichsstelle fuer Devisenbewirtschaftung (Foreign Exchange Bureau) which had control over the German exchange rate of currencies.

In addition to the controlled registered reichsmarks described, the laws of, or system in, Germany provided another class, officially described as "Free Exchange Reichsmarks," but usually referred to as "Free Reichsmarks." Appellant's brief describes these as follows: "Free Reichsmark balances are such balances which originated after July 15, 1931, with an internal credit institution or postal cheque office in Germany in favor of a person residing abroad—(1) from the sale of free convertible foreign exchange paid in by the foreign account owner himself and transferred to him by other foreigners or by persons residing in Germany, with official permission; (2) through transfers from other free accounts of foreigners; (3) through the credit of the proceeds of cheques and drafts which were paid to the debit of other free accounts of foreigners."

At the time of the transaction here involved in 1936, the Foreign Exchange Bureau did not permit the sale of free reichsmarks in Germany at less than the declared gold value of the standard gold reichsmark—$.4033—but it appears that the foreign (to Germany) owner of an account of free reichsmark balances might without other restriction (except, of course, that they could not be withdrawn from Germany in any appreciable quantities) draw checks and drafts against such balances. Appellant here, which is shown to have had in 1936 a large buying office and warehouse in Sonneberg, Thuringia, Germany used as its German headquarters, had a free reichsmark balance in the Deutsche Bank along with its registered reichsmark account.

It appears that in February 1936 Mr. Smith, accompanied by one of the company's buyers, went to Europe for the purpose of placing orders for merchandise, requisitions for which had been made by the various Woolworth stores throughout the United States, and on March 17, 1936, the order was written for the involved merchandise, the same being placed with a German manufacturer by the name of Carl Scheidig, who had carried samples of his goods to appellant's Sonneberg office.

Mr. Smith testified: "The purchase price shown on the invoice is exactly the same price he (Scheidig) quoted to us when we placed the order, the same price in which the order was written."

Payment was made, apparently in July 1936, at or about the time the merchandise was shipped from Germany. Expressed in reichsmarks, the total amount paid was R. M. 2716.25 (the equivalent of $1095.46+ in United States currency at the declared exchange rate), and in appraising for duty the local appraiser fixed this amount as the dutiable value. Payment was made by check or draft drawn on the Deutsche Bank, 10 per centum of the amount being charged to appellant's free reichsmark account and 90% charged to its registered mark account. Expressed in terms of United States currency the free reichsmarks had cost appellant $.4033 per reichsmark, or a total in United States currency of $109.54+, and the registered reichsmarks had cost it an average of $.2142 per reichsmark, a total in United States currency of $523.64. The grand total of the cost of the two classes was $633.18+, the average per mark being $.2331.

Another feature brought out in the testimony of Mr. Smith is that after the German manufacturer received payment of his bill all distinction in value between the reichsmarks paid to him out of the respective free and registered reichsmark account of appellant was wiped out. In other words, to the manufacturer one of the reichsmarks paid from the registered reichsmark account was worth the same as one of the marks paid from the free reichsmark account.

The situation described by Mr. Smith in connection with his transaction was typical of a general condition or practice in Germany with respect to various classes of merchandise, and this (together with other conditions and practices not necessary to be discussed here) led the Secretary of the Treasury to promulgate, on June 4, 1936 (69 Treas. Dec. 1008), T. D. 48360, which, so far as here pertinent, reads:

"Treasury Department,
"Office of the Commissioner of Customs,
"Washington, D. C.
"To Collectors of Customs and Others Concerned:

"Official reports and other data in the files of the Department establish to its satisfaction that bounties and/or grants are paid and/or bestowed, directly or indirectly, on the export to the United States of articles of the kinds named below, which are dutiable under the provisions of the Tariff Act of 1930.

"Notice is hereby given that, pursuant to the provisions of section 303 of the Tariff Act of 1930, countervailing duties equal to any bounty and/or grant found to have been paid and/or bestowed will be collected on articles of the kinds named below when imported directly or indirectly from Germany after thirty days following publication of this notice in a weekly issue of the Treasury Decisions.

"The liquidation of all entries covering merchandise of the kinds named below imported directly or indirectly from Germany after thirty days following publication of this notice in the weekly Treasury Decisions, shall be suspended pending the declaration of the net total amount of the bounty and/or grant determined or estimated to have been paid and/or bestowed, and the net amount of countervailing duties to be collected. A deposit of estimated countervailing duties shall be required at the time of entry in an amount equal to the percentage of invoice value stated below in connection with the name of the article.

"The articles subject to this notice are as follows:

| Article | Percentage of invoice value |
|---|---|
| * * * * * | |
| China tableware | 22 1/2 |
| * * * * * | |

"The facts in regard to each importation within the purview of this notice shall be reported promptly and in full to the Bureau of Customs.

"James H. Moyle,
"Commissioner of Customs.
"Approved June 4, 1936:
"H. Morgenthau, Jr.,
"Secretary of the Treasury.
"[Filed with the Division of the Federal Register June 6, 1936, 10:56 a. m.]"

It appears that before issuing the T. D. the Secretary of the Treasury requested the official opinion of the Attorney General of the United States concerning it, and such opinion was given in writing under date of June 2, 1936. 38 Op.Atty.Gen. 489. The Attorney General reviewed various practices described in the data submitted by the Secretary of the Treasury to be in operation in Germany (under one of which practices

transactions such as that here involved fell) and expressed the view that "the Treasury Decision proposed to be issued * * * is within the requirements of Section 303 of the Tariff Act of 1930, and its form is appropriate to carry out the mandate of that statute."

In the instant case the importer having secured from the Reichsbank or its subsidiary, the Treuhand-Gesellschaft, a permit to pay 90% of the purchase price out of its registered reichsmark account in the Deutsche Bank and 10% out of its free reichsmark account proceeded accordingly. The seller was aware of the fact that he was to be paid in this manner and priced his goods accordingly. Mr. Smith so testified, saying: " * * * If we had arranged to buy those particular goods in 100 per cent Free Marks the manufacturer would have quoted us a lower price in Marks, because he would have received an export subsidy, and therefore, would have been able to quote us a Mark price that was sufficiently lower to equal the basis on which we bought it on a Registered and Free Mark basis."

The manner in which the amount of the countervailing duty assessed was arrived at is stated in the brief on behalf of the Government before us, as follows: "Since the registered marks had been purchased at an average cost of $.2142 and the free marks at $.4033, the average cost to appellant of the marks used in purchasing the imported merchandise was $.2331. The difference between the price paid for the merchandise, and the price which would have been paid if all free marks had been used, amounts to $461.41. This is the amount of countervailing duty assessed on the present importation under the authority of Section 303, supra."

It is conceded here, as shown by the testimony of Mr. Smith above quoted, that if the merchandise had been wholly paid for with free reichsmarks whose value was arbitrarily declared by the German Exchange Control Board or bureau to be $.4033, the manufacturer upon the exportation of it to the United States, would have received a bounty or grant within the meaning of section 303 of the Tariff Act of 1930, but it is urged, in effect, that since 90% of the purchase price was paid in registered marks, of which a larger sum was required, there was no such bounty or grant.

It is fair to state that Mr. Smith testified that he "was opposed to the purchase of

any goods wherein an export subsidy of any kind figured," and doubtless he was seeking in entire good faith to avoid any such transaction with respect to goods purchased for export to the United States, and believed he was avoiding it, at least to the extent of 90% (and it may be here said that there is no contention relative to whatever bounty may have been involved in the use of 10% free marks, that apparently being covered by taking the average of $.2331 set forth in the above statement from the Government's brief) by the use of the registered mark account.

■ Notwithstanding our confidence in Mr. Smith's desire to avoid a transaction involving a bounty or grant and notwithstanding the reasoning of appellant's counsel, we are unable to escape the conclusion that by the very nature of the transaction, as shown by the undisputed facts of record, a bounty or grant was paid or bestowed—indirectly indeed, but nevertheless clearly. Section 303 covers a bounty or grant bestowed "directly or indirectly * * * however the same be paid or bestowed."

It is not possible to escape the conclusion from the record that the German Government by various devices and through different authorized governmental agencies was seeking to aid its manufacturers in invading foreign markets with their goods to compete in such markets with domestic producers. To this end various devices and practices were resorted to by and with the authority, encouragement, and aid of the German Government. Among such was the control of the registered marks and the limitations placed upon their use.

As has been said, concededly a bounty would have followed the payment of the total purchase price in free marks. It seems clear that, since the registered marks which were used became immediately worth the same to the manufacturer as free marks, the identical ultimate result in dollars and cents was obtained. In the one instance a direct bounty would have been paid; in the other the result was reached indirectly.

In view of the fact that there is no contention here respecting the law, we are not under the necessity of reviewing at length the decided cases and other authorities of which there are many. The brief on behalf of the Government cites the cases of Downs v. United States, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275; Id.,

354

4 Cir., 113 F. 144 (also referred to by appellant in connection with its argument based on the fact that the permits granted appellant were nonnegotiable—a matter not deemed by us to be of consequence here); Nicholas & Co. v. United States, 7 Cust. App. 97, T. D. 36426; United States v. Hills Bros. Co., 2 Cir., 107 F. 107; United States v. Passavant, 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644.

On the meaning of "bounty" and "grant" the Government brief cites Bouvier's Law Dictionary, Vol. 1, p. 385; Corpus Juris Secundum, 11 C.J.S. 742 [11 C.J.S., Bounties, § 1, p. 742]; Words and Phrases, First Series, Vol. 1, p. 854 [5 Words and Phrases, Permanent Edition, p. 735].

In the Nicholas & Co. case so cited, this court (whose decision was affirmed by the Supreme Court, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461), in discussing the purpose of the countervailing duty statute appearing in 1913 tariff act, said: " * * * Its plain, explicit, and unequivocal purpose is: Whenever a foreign power or dependency or any political subdivision of a government shall give any aid or advantage to exporters of goods imported into this country therefrom whereby they may be sold for less in competition with our domestic goods, to that extent by this paragraph the duties fixed in the schedule of the act are increased. It was a result Congress was seeking to equalize regardless of whatever name or in whatever manner or form or for whatever purpose it was done. The statute interprets itself as a member of an act calculated to maintain an accorded protection, incidental or otherwise, as against payments or grants of any kind by foreign powers, resulting in an equalization thereof to any extent directly or indirectly. Wherefore, in obedience to that obvious purpose, the court does not feel at liberty to adopt any constrained or technical definitions of the words 'bounty' or 'grant' suggested, but to vouchsafe the paragraph a meaning, well within its language, that will best effectuate the unquestioned congressional purpose."

The decision of the trial court in this case was rendered in a comprehensive opinion by Evans, J., who cited and reviewed various authorities. It is our view that the correct conclusion was there reached and the judgment is affirmed.

Affirmed.