**R D MANUFACTURING CORPORA-
TION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

C.D. 3792;  Protests 66/78761–
35848–65, etc.

United States Customs Court
Second Division.

April 21, 1969.

Eugene L. Stewart, Washington, D. C.,
Harry Inman, Washington, D. C., Wil-
liam Barnabas McHenry, New York City,
and Thomas L. Delaney, Washington, D.
C., for plaintiff.

William D. Ruckelshaus, Asst. Atty.
Gen. (Bernard J. Babb, New York City,
trial attorney), for defendant.

Before RAO and FORD, Judges.

RAO, Chief Judge:

These protests, which were consolidat-
ed for the purposes of trial, involve cer-

tain merchandise described on the invoices as signatures. The merchandise was classified by the collector of customs at the port of entry as articles composed wholly or in chief value of paper lithographically printed, not specially provided for, not over 0.012″ thick, under paragraph 1406 of the Tariff Act of 1930, as modified by Presidential Proclamation No. 3468, 97 Treas.Dec. 157, T.D. 55615, and Presidential Proclamation No. 3513, 98 Treas.Dec. 51, T.D. 55816, and was assessed with duty at the rate of 13½ cents per pound.

Plaintiff contends that the merchandise is entitled to free entry under paragraph 1629(a) of the Tariff Act of 1930, as amended by Public Law 490, 80th Congress, 83 Treas.Dec. 165, T.D. 51908, as publications issued for their subscribers or exchanges by scientific or literary associations or academies. Alternatively plaintiff claims that the merchandise is dutiable at 8 per centum ad valorem under the provisions of paragraph 1410 of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55816, as unbound books not of foreign authorship, or as pamphlets not of foreign authorship under paragraph 1410 of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55816, which claim was abandoned at the trial.

The pertinent parts of the statutory provisions here involved read as follows:

Paragraph 1406 of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55816:

Pictures, calendars, cards, placards and other articles (not including bands, decalcomonias, fashion magazines or periodicals, labels, flaps, or transparencies), composed wholly or in chief value of paper lithographically printed in whole or in part from stone, gelatin, metal, or other material (except boxes, views of American scenery or objects, and music, and illustrations when forming part of a periodical or newspaper, or of bound or unbound books, accompanying the same), not specially provided for:

Not over 0.012 inch thick ..................13.5¢ per lb.

Paragraph 1629(a) of the Tariff Act of 1930 as amended, *supra*:

Hydrographic charts and publications issued for their subscribers or exchanges by scientific or literary associations or academies, * * *.　　　　[Free]

Paragraph 1410 of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55816:

Unbound books of all kinds, bound books of all kinds except those bound wholly or in part of leather, sheets or printed pages of books bound wholly or in part in leather, pamphlets, music in books or sheets, and printed matter; all of the foregoing, not specially provided for:

　*　　*　　*　　*　　*　　*　　*　　*

Books (except diaries and music in books):

Of bona fide foreign authorship * * *

Other .............................8% ad val.

The record herein consists of the testimony of four witnesses and of fourteen exhibits which will be referred to, *infra*, as deemed pertinent.

Plaintiff's first witness, Melvin T. Williams, testified that he has been employed by The Reader's Digest Association, Inc. from 1958 and that since 1960 he has held the position of assistant to the production manager of the association. He stated that the plaintiff, R D Manufacturing Corporation, is a wholly owned subsidiary of the association and does not own or operate any printing facilities, but enters into contractual arrangements for the printing and binding of the various association publications; that his duties encompass all phases of the production of the Reader's Digest book programs and he was familiar with the imported merchandise; that due to certain printing delays in the United States he arranged for the printing of the imported signatures abroad in order to meet their mailing time schedule.

The witness identified three printed signatures, each consisting of 48 pages which, he said, were identical in physical form to the imported signatures, and they were introduced into evidence as plaintiff's exhibit 1. He stated that the imported signatures were combined with nine signatures domestically produced to complete volume 53 of the Reader's Digest Condensed Book Club series and that the imported signatures encompassed pages 25 through 96 and pages 481 through 552 of this volume. (Plaintiff's exhibit 3). He then identified nine other printed signatures, which were introduced in evidence as exhibit 2. These nine printed signatures were combined with the three signatures of exhibit 1 to complete the editorial content of volume 60 of the Reader's Digest Condensed Book Club series. He stated that he had personally prepared a graphically illustrated chart which visually illustrates the physical relationship of the three imported signatures to the nine domestically produced signatures contained in volume 53, and the chart was received in evidence as exhibit 4.

Williams testified that the process of producing the imported signatures in France was identical with that in the United States. That process consists of feeding a web or continuous roll of paper through a high-speed offset press which prints in continuous fashion a series of plates or impressions, each impression containing the text and illustrations of 72 separate pages. When printed on both sides of the paper a total of 144 separate page impressions are made. In identifying exhibit 6 the witness stated that it represents a single plate impression which has been removed or cut from the continuous web or roll of paper. After printing, the web of paper is mechanically cut, collated, and folded in continuous strips as shown in exhibit 7. These strips are then processed through a series of cutting cylinders which cut the continuous ribbons into 47-inch strips and then into three equal size 15¹¹⁄₁₆-inch signatures as in exhibit 8, each of which contains 48 sequentially numbered pages or a combined total for the three signatures of 144 separate page impressions. He stated that the printed sheet (exhibit 6), the collated and folded ribbons (exhibit 7), and the completed 48-page signature (exhibit 8) were all taken from the production run of a recent issue of the Reader's Digest Condensed Book Club series, and the finished signatures (exhibit 8) are identical in form to the imported signatures.

Williams identified correspondence and other documents between R D Manufacturing Corporation and the Paris subsidiary of The Reader's Digest Association, Inc. regarding the handling and printing of the three imported signatures. This correspondence and other documents were received into evidence as exhibit 9.

Williams further testified that he has made contractual arrangements on behalf of his employer for both printing and binding services with various printing establishments located throughout the United States and that on a number of these occasions he has contracted with various printing establishments for the production of a portion of the signatures

intended to be bound into a particular volume and that they were referred to as "books."

On cross-examination Williams stated that the membership of The Reader's Digest Condensed Book Club comprised those persons who ordered a book and paid for it in response to certain membership promotions which were undertaken by the Book Club; that they continued to be members so long as they paid for the said books, and that there was no membership fee required other than the payment for each volume they retained. He testified that the imported signatures were a part of the three following works which were incorporated in volume 53 (exhibit 3): "A River Ran Out of Eden," "Escape from Red China," and " * * * And Presumed Dead."

John T. Beaudouin, vice-president of The Reader's Digest Association, Inc. and the executive editor in charge of the Reader's Digest Condensed Book Club, gave testimony concerning the literary quality of the books selected for condensation and distribution to members of the Book Club and the method employed by his organization to obtain and prepare the material used in their publications. He stated that the guiding policy of the Book Club is to find and offer to its membership a representative selection of the best contemporary fiction and nonfiction available in the United States and that its editorial staff was selected upon the basis of prior experience in writing or editing.

A three-page foldout taken from the June 1967 issue of the Reader's Digest Magazine was identified by the witness as representative of the membership solicitation programs employed by the Book Club and it was introduced in evidence as exhibit 10. A comprehensive list of the books condensed and published by the Book Club from its inception in 1950 through 1967 together with markings to indicate the 97 titles which were found to be best sellers and the 25 titles which had received other awards for literary distinction was introduced in evidence as exhibit 11.

Mr. Beaudouin further stated that one of the compelling reasons for the sale of books was to earn a profit; that members of the Book Club did not hold any meetings and that nothing was done by the Book Club to foster any meetings of its members; that the Book Club had officers but that they were in no way selected by the members.

Frank M. Bitetto testified that he is the production manager for the Reader's Digest Association, Inc. and is responsible for the purchasing of and contracting for all of the printing and promotional materials for the association; that he commenced his career in printing as a pressman in 1926 with Conde Nast Publications and joined the Reader's Digest Association, Inc. in 1945 as assistant production manager and thereafter became production manager in 1956.

The witness stated that he was familiar with the imported merchandise before the court and that it was used as part of volume 53 of the Reader's Digest Condensed Book series and mailed to its members. He explained that part of his duties was to contact printers throughout the United States, particularly their business and production departments and that the imported merchandise and other signatures were referred to in the printing industry as either "signatures" or "books."

On cross-examination the witness stated that his experience covered all phases of the graphic arts, including printing and binding. He explained that a sheet became a signature only after it was mechanically folded; that plaintiff's exhibit 3, volume 53, is referred to in the trade as a "book"; that from the mere use of the term "book" there was no way of distinguishing whether a condensed volume was a "book" or a "signature." He further stated that his experience did not include the selling of either books or signatures.

On redirect examination Bitetto testified that plaintiff's exhibit 1, the folded signatures, would be referred to in the trade as "unbound books," whereas, plain-

tiff's exhibit 3, completed volume 53, would be designated as a "bound book."

Jack H. Corbin testified that he is employed as an account operator for R. L. Donnelly & Sons and that this firm is one of the largest printers and binders in the industry; that he started working with this firm as a production man in the press room in 1926 and after working in the planning department and serving a period in the Armed Forces of the United States he became an account operator in 1947; that his duties involved the coordination of sales and manufacturing with the customers.

He testified that he is personally familiar with merchandise similar to plaintiff's exhibit 1 in evidence and that it is referred to in the printing and binding trade as a "signature" and as an "unbound book." He explained that in the printing and binding trade the number of signatures to be incorporated into any one particular volume is dependent on the desires of the individual customer, and he stated that in his experience some customers have requested the binding of a single signature. He testified that his firm receives signatures to be bound from other printers and that prior to the binding the signatures are referred to by the parties as "unbound books."

On cross-examination Mr. Corbin testified that an "unbound book" may consist of one or more signatures and that volume 53 (plaintiff's exhibit 3) would be considered a "bound book" even if it had no permanent case or cover. He explained that the term "bound book" is used in the trade to refer to any work whose pages have been affixed together and will not tear apart, and that a permanent cover is not a necessary requisite for it to be termed a "bound book." He stated that an unbound book becomes a bound book when the pages are sewn or stitched together in accordance with the customer's direction.

On redirect examination Mr. Corbin testified that when pages are affixed together and a spine is created either by stitching or other means, the work then becomes a "bound book."

It is the contention of plaintiff that the evidence establishes that The Reader's Digest Condensed Book Club is a "literary association" within the meaning of the term as used in paragraph 1629(a) of the Tariff Act of 1930, *supra*, and that the imported signatures are publications which were issued to its subscribers, and therefore, are entitled to be entered free of duty under the provisions of that statute.

The defendant argues that The Reader's Digest Condensed Book Club is not primarily devoted to the promotion or advancement of the arts or sciences and is therefore not embraced by the term "literary association" as used in paragraph 1629(a) of the Tariff Act of 1930, *supra*.

It is apparent that there is little, if any, disagreement as to whether the imported signatures are "publications issued for their subscribers" within the meaning of that tariff term, and that our inquiry here is directed to that portion of paragraph 1629(a), *supra*, which reads "by a literary association."

In support of its contention that The Reader's Digest Condensed Book Club is a "literary association," plaintiff relies on various lexicographic definitions of the meaning of the terms "association," "clubs," and "book clubs." The Encyclopedia Americana, asserts the plaintiff, defines book clubs as *"private associations which print or release books only to their subscribers,"* [emphasis quoted] and the term "literary" is defined in the New English Dictionary, 1919, as "pertaining to books and written compositions." Based upon the foregoing definitions, argues the plaintiff, the record establishes that The Reader's Digest Condensed Book Club is embraced by the term "literary association," as it procures, edits, condenses, and publishes modern contemporary literature on behalf of its member subscribers and offers to its members a representative selection of the best contemporary fiction and nonfiction available in the United States. Furthermore, as evidence of its outstanding literary talent plaintiff points to the two

volumes of unsolicited praise received by the club's editors from the authors of the original works and of the receipt of numerous awards for its literary prowess.

The defendant, on the other hand, argues that the functions performed by The Reader's Digest Condensed Book Club are not unlike that of the ordinary publisher who sells its books by use of the mail; that the record discloses that the club's membership is obtained by use of the mail, and that it is purely a business enterprise whose primary concern is the sale of its books for profit.

Although the language of paragraph 1629(a), *supra*, has been a provision in the tariff laws since the Tariff Act of 1894, there does not appear to be any judicial precedent directly in point which could be decisive of the present issue. However, reference is made in the defendant's brief to two adjudicated cases which give some light on the type and character of the "literary association" intended by Congress to enjoy the benefit of free entry.

The first is Frank J. Markwalter & Co. v. United States, 44 Treas.Dec. 466, Abs. 46498, in which certain lithographic prints were imported by the Rockefeller Institute. The prints were classified as manufactures of paper under paragraph 1313 of the Tariff Act of 1922 and dutiable at the rate of 35 per centum ad valorem. The plaintiff claimed free entry under paragraph 1528, the predecessor provision of paragraph 1629(a), *supra*, which statute contained language identical with the statutory provision involved herein. The Board of General Appraisers sustained the protest and held that the merchandise was entitled to free entry as publications issued for their subscribers or exchanges by a scientific or literary association devoted to the pursuit of medical research in view of the fact that the prints, after importation, were bound in publications and distributed to medical societies, scientists, and hospitals.

The other case is that of Harvard University v. United States, 8 Cust.Ct. 332, C.D. 632, which involved the assessment of duty on library cards which were classified under paragraph 1410 of the Tariff Act of 1930 and dutiable at the rate of 20 per centum ad valorem as all other printed matter not specially provided for. Plaintiff claimed that these cards were entitled to free entry under paragraph 1615 as American goods returned, under paragraph 1629 as publications issued for their subscribers or exchanges by scientific or literary associations, or under paragraph 1630, as books and pamphlets printed wholly or chiefly in languages other than English. The cards were printed in Chinese and were part of the card-index catalog of the libraries of the Harvard Chinese Institute of Harvard University. They were sent to China for the purpose of printing a complete catalog in the form of bound volumes and of index cards, and after importation of 50 complete sets they were distributed to leading universities, educational institutions, and libraries in the United States. The court, in sustaining plaintiff's claim under paragraph 1629, stated as follows at pages 336 and 337:

The remaining question for consideration is whether or not the library cards in question may be regarded as "publications issued for their subscribers or exchanges by scientific or literary associations or academies." In the case of Roger & Gallet v. United States, 5 Ct.Cust.Appls. 443, T.D. 34973, the term "publications" was held to refer to something that conveyed some information of a general character. Library cards in sets, distributed or exchanged with other libraries, would therefore come within the meaning of a publication, because of the notification to other libraries that certain Chinese and Japanese books were made available by Harvard College in its Library of Harvard Chinese Institute. The Library of the Harvard Chinese Institute of Harvard University, a part of Harvard University, clearly is within the meaning of the tariff terms: "scientific or literary associations or academies," as it constitutes an association formed for the advance-

ment of science or art. Therefore we are of the opinion that the library cards in question are entitled to free entry as publications issued for its subscribers or exchanges by scientific or literary associations or academies, under the provisions of paragraph 1629, as claimed.

■ It is a matter of common knowledge of which the court may take judicial notice that the Rockefeller Institute and Harvard University are nonprofit organizations whose primary purpose and devotion is the advancement of education and science for the benefit of humanity.

Further assistance on the meaning of the terms in question is provided by tariff history in the Summary of Tariff Information, 1929. Commenting on paragraph 1528 of the Tariff Act of 1922, at page 2222 it is stated:

Descriptions and uses.—The items mentioned in paragraph 1528 are of a character in themselves ordinarily dutiable under paragraph 1310 and other paragraphs. They are to be admitted free only when they fulfill certain conditions stated in this paragraph (1528).

The Dictionary of Tariff Information, 1924, at page 73, states as follows:

*Books.*

\*   \*   \*   \*   \*   \*

Certain classes of books or printed matter are granted free admission when imported under conditions prescribed or for specific purposes. Among these are books or libraries brought in by persons emigrating to the United States, for their personal use and not for sale; importations by societies or institutions for religious, philosophical, scientific, educational, or literary purposes, for the use of such societies and not for sale; importations for the use of the United States or the Library of Congress; charts and publications issued by scientific societies for the use of their subscribers and exchanges; publications of individuals

for gratuitous private circulation; and books to be used exclusively by the blind or for teaching the blind.

Other publications and printed matter for which free admission is provided are books, charts, etc., more than twenty years old at time of importation; books in languages other than English, and public documents issued by foreign governments.

It will be observed from the foregoing that merchandise which would be ordinarily assessed with duty upon importation is entitled to free entry only under certain prescribed conditions or for specific purposes. Furthermore, when books or printed matter are afforded free entry for use by individuals, the condition prescribed is that they are for personal use only and not for sale, and with respect to societies or institutions, that they are for use of the societies and their subscribers and not for sale.

■ In construing the congressional intent of the term "literary association" as used in the statute there seems to be no question that it embraces those societies or associations whose primary devotion and purpose is the advancement of the arts and sciences and whose books or printed matter issued by them are for the use of the society and its subscribers and not for sale or profit.

The record discloses that The Reader's Digest Condensed Book Club and the plaintiff, R D Manufacturing Corporation, are divisions of the parent company, The Reader's Digest Association, Inc., the publisher of The Reader's Digest Magazine. The record further discloses that while the editors of The Reader's Digest Condensed Book Club enjoy great literary skill and maintain a broad appeal to the general public, The Reader's Digest Condensed Book Club is a commerical enterprise whose aim is profit for its owners, The Reader's Digest Association, Inc., which profit is obtained from the payment for the sale of its books by those who keep the books mailed

to them. Apropos of this, the witness Beaudouin testified as follows:

Q. When the Book Club sells its books to its members, is it your aim to realize a profit to any extent on the sale of your books?—A. It is.

Q. And is this the reason why you attempt to get the widest possible circulation?—A. Yes, that is one of several reasons. I would say it is the compelling reason.

Q. It is the compelling reason?— A. I wouldn't say it is the compelling reason, but I would say certainly since we are a business enterprise it is clear we would not operate the Book Club if we would not operate it profitably.

■ We are therefore constrained to agree with the defendant that the Reader's Digest Condensed Book Club is not a "literary association" within the meaning of the term as used in paragraph 1629(a), *supra.*

Turning to plaintiff's alternative contention that the imported signatures are classified as "unbound books" in paragraph 1410 of the Tariff Act of 1930, *supra,* counsel argues first, that the record herein establishes that the imported signatures are embraced by the common meaning of the term "unbound books," and second, that the term "unbound books" is a commercial designation existing in the trade and commerce of the United States prior to 1930 and embraces the imported signatures at issue.

With respect to the first argument plaintiff's counsel asserts that the classic form of printed matter dedicated to use as a book is the signature, and that the imported signatures were dedicated for use as a book and for no other purpose. Plaintiff's brief cites the case of Macmillan Co. v. United States, 116 F. 1018 (C.C.S.D.N.Y.1902) as "direct authority" for the classification of the imported signatures as "unbound books."

Defendant argues that the imported signatures are not unbound books, but are merely parts of a book, as the record discloses that they were combined with a substantial number of other signatures to complete volume 53 of The Reader's Digest Condensed Book Club series, and furthermore, that they do not express the complete thought of the author, and thus, are not embraced by the term "unbound books" as used in the statute.

The *Macmillan* case, *supra,* involved printed sheets of an English work entitled "Cleland and Mackay's Anatomy," which were imported unbound, to be bound up with a few pages at the beginning or end of the book that had been printed in this country by an American publisher. It was conceded that this was a "scientific book." The court held the book was entitled to be admitted free of duty under paragraph 410 of the Tariff Act of 1894, stating that "these sheets did not cease to be a book because some few pages at the beginning or end were wanting."

It is apparent that the reasoning employed in the *Macmillan* case, *supra,* was that the book was practically complete except for a few pages. In the instant case, the facts are substantially different, as the imported signatures consisted only of 144 pages, or approximately one-fourth of a volume which was to contain 575 pages when completed, and moreover no one of the subject signatures contained the entire version of the condensation intended to be used.

Similarly, the cases of American Express Co. v. United States, 20 Treas.Dec. 643, Abs. 25256, and Carson M. Simon & Co. v. United States, 31 Cust.Ct. 53, C.D. 1544, cited by plaintiff's counsel in their brief, are readily distinguishable from the case at bar. While the imported merchandise in those two cases was classified as "unbound books" under paragraph 416 of the Tariff Act of 1909 and paragraph 1410 of the Tariff Act of 1930 respectively, they were completed books in their imported condition, whereas the merchandise herein consisted of only one-fourth of the pages intended for the completed book.

■ Our appellate court, in the case of Leonard Levin Co. v. United States,

27 CCPA 101, C.A.D. 69, affirming the decision of the trial court, quoted therefrom as follows:

> * * * It is the condition of merchandise as imported that controls its classification, not what it is made into after importation.

In the light of this well settled rule of law and in view of the foregoing, we find no merit in plaintiff's contention that the imported signatures are classifiable as "unbound books" in paragraph 1410 of the Tariff Act of 1930, *supra*.

■ In plaintiff's alternative argument for classification in that statute, it contends that the record establishes that the term "unbound books" is a commercial designation which existed in the trade and commerce of the United States prior to the Tariff Act of 1930 and that the said term encompasses the signatures here in issue. Plaintiff asserts that the witnesses Bitetto and Corbin were eminently qualified to testify regarding the commercial designation of the imported merchandise, as they both commenced their respective careers in the printing and binding trade prior to 1930, and that both witnesses testified that in that trade folded signatures are referred to as "unbound books."

Defendant contends that in order to establish a commercial designation for the term "unbound books" contrary to the common meaning at the time of the enactment of the Tariff Act of 1930, plaintiff must show that it is definite, uniform, and general throughout the publishing and book selling industries in the United States, and that plaintiff's witnesses failed in this regard, their testimony being minimal and limited in scope.

In the case of John A. Steer Company v. United States, 41 Cust.Ct. 156, C.D. 2034, our appellate court stated:

> The burden of proof of commercial designation is an onerous one. It requires that there shall be shown by a preponderance of evidence that the trade meaning was so well understood by those dealing with the product throughout the country that Congress must have been presumed to have taken cognizance of it. As stated in the case of Jas. Akeroyd & Co. et al v. United States, 15 Ct.Cust.Appls. 440, T.D. 42641:

> > Commercial designation is a thing often claimed in customs litigation and rarely established. The rule of commercial designation was never intended, as has been often said, to apply to cases where some portion of the trade use a certain trade practice or nomenclature, but was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted. There was never any other reason for the rule.

That the testimony of plaintiff's witnesses falls short of these requirements needs no extended elaboration. They did not establish a commercial meaning so well understood that Congress must have been presumed to have been cognizant of it. The witnesses indicated that the printing industry uses the terms signatures and books interchangeably but they gave no precise or definite meaning for these terms. Therefore we hold that commercial designation has not been established here.

In view of the foregoing and based on the record before us, we find and hold that the plaintiff has failed to overcome the presumption of correctness attaching to the classification of the collector. The claim of the protests as consolidated for classification under paragraph 1410 of the Tariff Act of 1930, as modified by Presidential Proclamation No. 3468, 97 Treas.Dec. 157, T.D. 55615, and Presidential Proclamation No. 3513, 98 Treas. Dec. 51, T.D. 55816, for pamphlets not of foreign authorship, having been abandoned, is dismissed. All other claims are, however, overruled.

Judgment will be rendered accordingly.