**HAMMOND LEAD PRODUCTS, INC.**

v.

**UNITED STATES (Ralph Valls, Party-in-Interest).**

**C.D. 3915; Protest 67/77548–5928.**

United States Customs Court,
First Division.
Nov. 7, 1969.

Alvord & Alvord, Washington, D. C. (Albert H. Greene, Washington, D. C., of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Brian S. Goldstein, New York City, trial attorney), for defendant.

Chapman, Di Salle & Friedman, Washington, D. C. (Paul A. Lenzini, Washington, D. C., of counsel), for party-in-interest.

Before WATSON, MALETZ, and RE, Judges.

MALETZ, Judge:

The single question in this case—which comes before the court on an American manufacturer's protest—is whether the Mexican Government, directly or indirectly, bestows a bounty or grant, within the meaning of section 303 of the Tariff Act of 1930 (19 U.S.C. § 1303), upon the manufacture, production or exportation of a lead oxide known as litharge. Section 303 provides:

> Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this chapter then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this chapter, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

The case arises in the following way: In May 1967, plaintiff, a domestic manufacturer of litharge, filed a complaint with the Commissioner of Customs—pursuant to section 516(b) of the Tariff Act of 1930 (19 U.S.C. § 1516(b))—to the effect that litharge imported from Mexico was the recipient of a bounty or grant, thus requiring the imposition of an additional countervailing duty un-

**462**

der section 303.[1]  After consideration of the complaint, the Commissioner declined to impose countervailing duties.  See T.D. 67–142 (1967).  Plaintiff then filed timely notice that it desired to protest the decision.  Subsequently it was notified by the District Director of Customs, Laredo, Texas, of the liquidation of an entry of litharge which was imported from Mexico on August 2, 1967.  Plaintiff thereupon filed a protest with the District Director at Laredo, and a trial was later held in this court.[2]

We start with the facts as shown by the record.  First, by way of background, it is to be noted that litharge is a lead oxide which is manufactured through the simple process of oxidizing refined (pig) lead.[3]  The finished product—litharge—contains 93 percent lead and 7 percent oxygen, and is primarily used in lead storage batteries.[4]  It is also used in the chemical industry for products such as lead arsenates and lead stabilizers, and in the pigments industry for lead chromates, etc.  There is a close relationship between the cost of refined lead and the price of litharge.  Thus, in the United States, during the past decade there has existed a spread of between 2¼ to 2½ cents between the cost of refined lead and the selling price of litharge.  In January 1969, as an example, the cost of lead in the United States was 13½ cents per pound, and the selling price of domestic litharge was 16 cents per pound.  Emphasizing the simplicity of manufacturing litharge is the fact that this 2½-cent differential includes the total cost of converting lead into litharge, packaging, sales, and overhead, plus an element of profit to the manufacturer.

We consider now the laws of Mexico which according to plaintiff operate as a bounty upon the production and exportation of litharge.  At the outset it is to be observed that on July 31, 1967, refined lead was subject by Mexico to an ad valorem export tax of 27.50 percent, based on an official valuation of 3.275 pesos per gross kilogram,[5] and on December 31, 1968, the tax was 20 percent based on a valuation of 3.0001 pesos per

1.  The litharge was classified by the Bureau of Customs under item 473.52 of the Tariff Schedules of the United States (19 U.S.C. § 1202) at 1.25 cents per pound, and this classification is undisputed.  That item, it may be added, provides:

    Pigments (except pigments, in dry form, described in the foregoing provisions of this subpart) :
    *　*　*　*　*
    Containing lead:
    *　*　*　*　*
    473.52 Litharge ........ 1.25¢ per lb.

2.  Defendant and the party-in-interest (the importer) filed motions to dismiss the protest on the ground that the court lacked jurisdiction to consider a protest filed by an American manufacturer under section 516(b) challenging a determination by the Secretary of the Treasury that a foreign government did not pay or bestow a bounty or grant upon exportation.  The court held that it had jurisdiction and denied the motions to dismiss.  Hammond Lead Products, Inc. v. United States, 61 Cust.Ct. 137, C.D. 3552, 289 F.Supp. 533 (1968).  In answering plaintiff's present brief, defendant again insists that this court lacks jurisdiction to resolve the controversy.

The arguments it presents on this aspect are in essence repetitive of several arguments it had previously made in the original motion to dismiss.  Having upon detailed consideration found each such argument without merit, we see no reason for departing from our prior holding.  Nor do we find in point any of the cases now relied on by defendant here for the first time—i. e., Waterman Steamship Corp. v. United States, 30 CCPA 119, C.A.D. 223 (1942) ; American Viking Corp. et al. v. United States, 37 Cust.Ct. 237, C.D. 1830 (1956) ; United States v. Tower & Sons, 14 Ct.Cust.Appls. 421, T.D. 42058 (1927) ; and H. K. Wheeler, Inc. v. United States, 9 Cust.Ct. 30, C.D. 655 (1942).

3.  The terms "pig lead" and "refined lead" are used interchangeably.  See I Minerals Yearbook (1954), p. 661.

4.  About half the weight of such a battery consists of litharge.

5.  The Diario Official of December 31, 1957, established the 27.50 percent tax rate for refined lead.  The rate was reduced to 20 percent by the Diario Official of August 26, 1967.

kilogram.[6] Conversion of the pesos to cents [7] and the kilograms to pounds [8] shows that the export tax on refined lead was approximately 2.27 cents per pound on July 31, 1967, and 2.18 cents per pound on December 31, 1968.

There is another important aspect to the Mexican tax structure pertaining to refined lead. In Mexico there are only two producers of refined lead, both of whom have plants in Monterrey. Each month there is published in Mexico a weighted average price of all sales of refined lead by these companies in export markets worked back to an f. o. b. Monterrey basis. This weighted average monthly Monterrey price represents the average amount realized from sales of refined lead made abroad by the two Mexican producers *after deducting* any import duties paid to foreign countries, freight, insurance and other costs. However, this weighted Monterrey price *includes* the tax imposed by Mexico on the export of refined lead.[9] For the month of July 1967 the weighted average Monterrey price was 10.48 cents per pound, and for the month of December 1968 it was 10.3 cents per pound. By contrast, the selling price of refined lead

produced in Mexico and sold to domestic consumers was 8.6 cents per pound in both July 1967 and December 1968. The reason why the cost of refined lead to the Mexican consumer is less than the realization from export sales of refined lead, worked back to a Monterrey basis, is that the Mexican Government requires the two Mexican producers of refined lead to deduct the amount of the export tax from the Monterrey price when selling to domestic consumers.[10]

Refined lead, it may be added, is an internationally traded commodity which is sold at a price which reflects the supply and demand of the world.[11] The international price of refined lead is quoted daily on the London metal exchange.[12] Further, the Monterrey price —which (as we have seen) includes the Mexican export tax on refined lead— approximates the world f. o. b. selling price of refined lead. For example, the average Monterrey price in July 1967 (as mentioned previously) was 10.48 cents per pound; the average quote on the London metal exchange for July 1967 was 83 pounds, 18 shillings and 5 cents per ton of 2,240 pounds,[13] or 10.44 cents per pound. Since the Monterrey price

6. These official valuations applied only to refined lead exported to the United States; a lower valuation existed for exports to countries other than the United States.

7. From 1962 to August 1969, the par value of the peso was 12.49 pesos per U.S. *dollar.* See *International Financial Statistics,* International Monetary Fund, Vol. XXII, No. 8 (August 1969).

8. A kilogram is equal to 2.2046 pounds. See e. g., *Webster's New International Dictionary* (2d ed. unabridged, 1948).

9. The Monterrey price is published in order to provide a basis upon which the two Mexican refining companies pay miners for the lead content of their ore after deducting a fee for the smelting and refining.

10. The Mexican Government has agreed, however, that it is proper for the two producers of refined lead in Mexico, when selling to domestic consumers, to add back certain charges to cover interest for insurance on sales made with payment in

90 days, and to cover selling expenses and credit losses. For this reason, the difference between the Monterrey price and the domestic price of refined lead is not represented solely by the export tax on refined lead.

11. See e. g., *The London Metal Exchange,* Economic Intelligence Unit Ltd. (1958); 1969 Commodity Year Book, Commodity Research Bureau, pp. 202–26; Vols. I–II Minerals Yearbook (1967), pp. 647–75.

12. Ibid. The price on the London metal exchange is an f. o. b. country-of-origin quote and thus is below the New York price which reflects the price of refined lead actually imported into the United States—which price has absorbed all the attendant costs of exportation. See U. S. Tariff Commission, Trade Agreement Between the United States and Mexico (1943), pp. 55–56.

13. Engineering and Mining Journal, August 1967. In July 1967 the par value of the pound was equal to $2.784. See International Fund Statistics, op. cit. *supra* at note 7.

approximately equals the international price of refined lead, and since the Monterrey price includes the Mexican export tax, it is evident that the Mexican export tax results in raising the cost of Mexican refined lead to the international price of that commodity. However, since the export tax on refined lead is deducted from the Monterrey price to establish the price to the Mexican consumer, the result is that the Mexican consumer purchases refined lead well below the international price.

We turn next to the Mexican taxing system on exportation of lead manufactures. Prior to 1954, litharge and the other manufactures of lead were subject to ad valorem export taxes. However, by the Diario Official of May 22, 1954, lead oxides, lead wire up to 5 millimeters diameter, lead sheets and plates up to 4 millimeters thickness, and lead pipe up to 40 millimeters of outside diameter (provided the thickness of the wall be up to 5 millimeters) were exempted from export taxes. But beginning on December 31, 1957, a different tariff classification system was utilized. On that date, by a decree published in the Diario Official, an export tax was reimposed on all these lead manufactures, except lead oxides and lead wire up to 5 millimeters diameter. Subsequently, an export tax was levied on the latter commodity by the Diario Official of February 12, 1958. Hence as of February 1958, the lead oxides were the only simple lead manufactured products which were exempt from export taxes. The rate of export tax in Mexico as of July 1, 1967 and December 31, 1968 on these manufactures of lead was, as follows:

| Commodity | Date | Ad Valorem Export Tax Rate |
|---|---|---|
| Lead rolled bars | 7/1/67 | 25% |
| | 12/31/68 | 25% |
| Lead wire up to 5 millimeters diameter | 7/1/67 | 27.50% |
| | 12/31/68 | 27.50% |
| Lead wire over 5 and up to 10 millimeters diameter | 7/1/67 | 27.50% |
| | 12/31/68 | 27.50% |
| Lead slabs or sheets up to 4 millimeters thick | 7/1/67 | 23% |
| | 12/31/68 | 23% |
| Lead plates over 4 millimeters thick | 7/1/67 | 25% |
| | 12/31/68 | 25% |
| Lead pipes up to 40 millimeters diameter, provided wall thickness up to 5 millimeters | 7/1/67 | 14% |
| | 12/31/68 | 14% |
| Lead pipes, not specified | 7/1/67 | 25% |
| | 12/31/68 | 25% |
| Yellow lead oxide (litharge); red lead oxide | 7/1/67 | Exempt |
| | 12/31/68 | Exempt |

This brings us to the issue in the case —whether the Mexican Government, through the foregoing tax system, bestows, directly or indirectly, a bounty or grant upon the manufacture, production, or exportation of litharge within the meaning of section 303 of the Tariff Act of 1930, so as to require the imposition of an additional countervailing duty equal to the net amount of such bounty or grant.[14]

Countervailing duty legislation originated in the United States with the Tariff Act of 1890 which provided for the imposition on all sugar above number 16 Dutch standard in color—i. e., all refined sugar—of a duty of one-tenth of one cent per pound, in addition to the ordinary duty, when exported from any country which paid directly or indirectly, a higher bounty on the exportation of sugar than on raw sugars of a lower saccharine content. 26 Stat. 584. In the Tariff Act of 1894, there was substituted a provision for the application of an additional duty of one-tenth of one cent per pound on all imports of sugar from countries which granted direct or indirect bounties thereon. 28 Stat. 521.

Section 5 of the Tariff Act of 1897, 30 Stat. 205, expanded the coverage of countervailing duties to all imports, dutiable under that act, which received a bounty or *grant* upon exportation.[15] This provision was retained in the Tariff Acts of 1909 and 1913. 36 Stat. 85; 38 Stat. 193–94.

Section 303 of the Tariff Act of 1922, 42 Stat. 935–36, enlarged the scope of countervailing duty protection from any bounty or grant upon exportation to any bounty or grant upon manufacture or production or export. The present provision, section 303 of the Tariff Act of 1930, is substantially the same as the 1922 act.

Several cases have dealt with the meaning and scope of the words "bounty" and "grant" as used in the countervailing duty provision. For example, United States v. Hills Bros. Co., 107 F. 107, 46 CCA 167 (2d Cir., 1901), involved provisions of Dutch law under which Holland gave a bounty for the production of sugar to be deducted from the excise thereon. However, such excise was remitted on exportation. The court held that the practical effect of the Dutch law was to make the remission of the excise tax from the standpoint of other countries a bounty on exportation. So far as a foreign country was concerned, the court pointed out, the result of the system was no different from what it would be had it provided that all sugar producers were to receive a bounty paid in cash from the government. "Those who export their sugar may keep this bounty, those who do not export it must forthwith return it to the government." Id. at 109.

Downs v. United States, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903), concerned the laws of Russia which imposed a tax on all sugar produced but remitted the tax upon all sugar exported. An additional provision allowed the Russian exporter of sugar to obtain from the government a certificate solely because of such exportation, which certificate was salable and had an actual value in the open market. The Court affirmed the decision below and held (1) that "[w]hen a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever

---

14. The theory underlying countervailing duties was explained by the Tariff Commission, as follows: "When export bounties * * * either direct or indirect, are paid upon goods, such bounties neutralize more or less the duties that may be charged upon their importation into other countries and the protection thereby accorded. To reestablish the original amount of protection, the importing country may provide that for articles upon which export bounties are paid

a protective surtax shall be charged. Such a surtax is known as a countervailing duty." U. S. Tariff Commission, Dictionary of Tariff Information (1924), p. 205.

15. The addition of the word "grant" was recognized as "significant of a purpose to extend the latitude of the provision." Nicholas & Co. v. United States, 7 Ct. Cust.Appls. 97, 104, T.D. 36426 (1916), aff'd 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919).

manner, or under whatever name, it is disguised, it is a bounty upon exportation" (p. 515); and (2) that since under the laws of Russia the Russian exporter of sugar obtained from the government a certificate which had actual value, the Russian government provided the Russian exporter, when he exported, a money reward or gratuity—which reward or gratuity was in effect a bounty on exportation. In the course of its opinion the Court dealt extensively with the word "bounty," stating (187 U.S. at 501–502, 23 S.Ct at 223):

A bounty is defined by Webster as "a premium offered or given to induce men to enlist into the public service; or to encourage any branch of industry, as husbandry or manufactures." And by Bouvier as "an additional benefit conferred upon or a compensation paid to a class of persons." In a conference of representatives of the principal European powers, specially convened at Brussels in 1898 for the purpose of considering the question of sugar bounties, the definition of bounty was examined by the conference sitting in committee, who made the following report:

"The conference, while reserving the question of mitigations and provisional disposition that may be authorized, if need be by reason of exceptional situations, is of opinion that bounties whose abolition is desirable are understood to be all the advantages conceded

to manufacturers and refiners by the fiscal legislation of the states, and that, directly or indirectly, are borne by the public treasury."

"There should be classified as such, *notably*:

"(a) The direct advantages granted in case of exportation.

"(b) The direct advantages granted to production.

"(c) *The total or partial exemptions from taxation granted to a portion of the manufactured products.*[16] [Emphasis added.]

"(d) The indirect advantages growing out of surplus or allowance in manufacturing effected beyond the legal estimates.

"(e) The profit that may be derived from an excessive drawback."

In the decision below—Downs v. United States, 113 F. 144, 51 CCA 100 (4th Cir., 1902), which was affirmed by the Supreme Court—the Fourth Circuit stated (pp. 147–148):

" * * * The word 'grant' is more comprehensive in meaning than the term 'bounty.' It implies the conferring by the sovereign power of some valuable privilege, franchise, or other right of like character, upon a corporation, person, or class of persons. * * "

"These cases are cited for the purpose of illustrating the broad and comprehensive meaning of 'grant,' which differs in many respects from 'bounty'.

16. The U. S. Tariff Commission's Dictionary of Tariff Information (1924) likewise recognized that exemptions from tax may constitute an export bounty under certain circumstances. Thus the Dictionary pointed out that in the seventeenth and eighteenth centuries, France gave what amounted to export bounties for silk culture and various industrial enterprises. "The bounties were usually granted to particular individuals rather than to industries in general. *They took various forms, such as freedom from taxes,* the bestowal of gifts, annual pensions, loans without interest, etc." [Emphasis added.] Id. at 76. The Dictionary also pointed out that in the nineteenth century indirect forms of bounties were found in certain exemptions or reductions of duties granted to new enterprises. Id. at 77. The Dictionary further observed that Haiti, among other countries, granted indirect export bounties "in the form of concessions to stimulate the development of the country's agricultural resources, *such concessions occasionally calling for full or partial exemption from Federal taxes.*" [Emphasis added.] Id. at 78. The Dictionary of Tariff Information is relevant, of course, in considering the legislative history of the Tariff Act of 1930. E. g., R D Manufacturing Corp. v. United States, 62 Cust.Ct. 421, 429, C.D. 3792, 298 F.Supp. 1192, 1198 (1969).

While it involves the idea of a favor or benefit conferred by the government, sometimes of an exclusive character, it does not necessarily embrace the act of appropriating or paying money out of the public treasury. Indeed, the word 'grant,' in its broad signification, may well include the remission of a tax already levied and assessed by the authority of government. It has been held that \* \* \* actions of debt may be maintained for the collection of taxes. \* \* \* There would seem to be no difference between the remission of a tax, and the resulting cancellation of the debt due the government, and a case where the tax may have been actually collected and paid into the treasury and then refunded and repaid by authority of law. \* \* \* "

Another leading case is Nicholas & Co. v. United States, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919), which involved the question as to whether British law covering the export of spirits constituted a bounty or grant. Under British law a duty was levied upon every gallon of spirits of a certain strength which was distilled within the United Kingdom or which, having been distilled therein, was in the stock or possession of any distiller in any duty-free warehouse and which, after a specified date, was taken out for consumption within the United Kingdom. British law further provided for payment to any distiller of an allowance of three pence per gallon upon the exportation thereof from a duty-free warehouse or upon the deposit of such spirits in a customs warehouse. Provision was also made for payment of five pence per gallon to a rectifier for spirits that the rectifier deposited in a customs warehouse. The Court affirmed the decision of the Court of Customs Appeals and held that notwithstanding the fact that such allowances may have been intended merely as compensation to distillers and rectifiers for costs due to British excise regulations, they were, as applied to export, governmental payments—"grants"—made only upon exportation which, by lessening the burden of British taxation, enabled

the spirits to be sold more cheaply in the United States rather than in the United Kingdom. Pertinent are the following comments of the Court:

\* \* \* There is paid to an exporter of spirits from the United Kingdom the sum of three or five pence a gallon, as the case may be, and the instant conclusion is that the sale of spirits to other countries is relieved from a burden that their sale in the United Kingdom must bear. There is a benefit, therefore, in exportation, an inducement to seek the foreign market. And thus it would seem, if we regarded the substance of things, that the condition of the application of \* \* \* [the countervailing duty provision] obtains. [p. 37, 39 S.Ct. p. 219]

\* \* \* \* \* \*

\* \* \* The statute was addressed to a condition and its words must be considered as intending to define it, and all of them—"grant" as well as "bounty"—must be given effect. If the word "bounty" has a limited sense the word "grant" has not. A word of broader significance than "grant" could not have been used. Like its synonyms "give" and "bestow," it expresses a concession, the conferring of something by one person upon another. And if the "something" be conferred by a country "upon the exportation of any article or merchandise" a countervailing duty is required \* \* \*. [p. 39, 39 S.Ct. p. 220]

In the decision below in Nicholas & Co. v. United States, 7 Ct.Cust.Appls. 97, T.D. 36426 (1916)—which was affirmed by the Supreme Court—the court made the following germane remarks (pp. 106-07):

There is nothing obscure, abstruse, mystic, or even ambiguous about this language, which has been, as to the particular words, a part of all our tariff acts from 1897 to and including the present act. \* \* \* Its plain, explicit, and unequivocal purpose is: Whenever a foreign power or dependency or any political subdivision of a

government shall give any aid or advantage to exporters of goods imported into this country therefrom whereby they may be sold for less in competition with our domestic goods, to that extent by this paragraph the duties fixed in the schedule of the act are increased. It was a *result* Congress was seeking to equalize regardless of whatever name or in whatever manner or form or for whatever purpose it was done. The statute interprets itself as a member of an act calculated to maintain an accorded protection, incidental or otherwise, as against payments or grants of any kind by foreign powers, *resulting* in an equalization thereof to any extent directly or indirectly. * *

* * * * * *

The fact that the payment made by the foreign government was estimated or calculated upon a certain basis or in consideration of extra burdens imposed by domestic excise laws, or for any other reason of domestic government or policy commending itself to the wisdom of Parliament, is not controlling with our courts. The sole inquiry is, do the results of such acts stimulate exportation or give a special advantage by affording aid from the public treasury whereby such goods may when exported be sold in competition with ours for less. * * *

* * * * * *

* * * If it be true that the excise system delineated intentionally or accidentally results in "an advantage to exporters of spirits to this country from the United Kingdom of Great Britain, which directly or indirectly is borne by the public treasury," or affords "a premium in like manner given or paid to encourage any branch of industry or manufacturers," likewise exporting, such falls within this paragraph. * * * The courts are concerned with results and not intentions.

In light of what has been said, we must conclude that the Mexican system of taxation on refined lead and lead manufactures constitutes a bounty or grant on the exportation of litharge. In the first place, while refined lead is taxed upon exportation, there is no equivalent tax when refined lead is sold for consumption in Mexico. This is because the export tax on refined lead is deducted from the Monterrey price in establishing the price to the Mexican consumer. Thus Mexican fiscal policy enables the Mexican consumer of refined lead to procure the metal well below the international price of that commodity. When it is considered further (i) that the Mexican litharge producer is such a consumer; (ii) that refined lead is the primary material in litharge; and (iii) that the cost of refined lead represents the predominant cost of producing litharge, there can be no doubt that Mexican fiscal policy furnishes an advantage to Mexican producers of litharge.[17] In Downs v. United States, *supra*, 187 U.S. at 513, 23 S.Ct. at 228, the Supreme Court stated that "if a preference be given to merchandise exported over that sold in the home market, by the remission of an excise tax, the effect would be the same as if all such merchandise were taxed, and a drawback repaid to the manufacturer upon so much as he exported." In the present case, the tax situation in Mexico is the same except for direction. All refined lead exported is subject to tax; all refined lead sold domestically is free of such tax. This is equivalent to a situation where all refined lead produced was subject to a tax, and upon the domestic sale such tax was actually repaid or remitted.

Further, as stated before, litharge is a simple manufactured product. In addition to the fact that its predominant cost of production is the cost of refined lead, the record shows that the ultimate

---

17. The comments here and hereafter with reference to the exemption of litharge from the Mexican export tax apply equally, of course, to the other lead oxides which have similarly been exempt from export duty.

selling price of litharge is inextricably linked to the price of refined lead. However, there are other lead products which possess these same characteristics. Lead rolled bars, lead wire, lead slabs or sheets, lead plates and lead pipe are all simple manufactures of lead, the weight of which consists primarily of lead, and the price of which is tied to the price of lead. However, litharge is exempt of taxes upon exportation, while these other simple manufactures must (as set out previously) incur an export tax. This preferential export tax structure results in the fact that litharge may be exported at a proportionately lower price than the other simple manufactured lead products such as bars, wires, sheets, plates and pipes. .Such a tax structure affords an inducement to export litharge—which is not similarly provided to the producers of these other simple manufactured lead products. Comparison of the export statistics for the various lead products confirms this to be the case.

### Exports from Mexico (Kilograms)

|      | Litharge | Lead Rolled Bars | Lead Wire | Lead Slabs or Sheets | Lead Pipes | Lead Pipes, Not Specified |
|------|----------|------------------|-----------|----------------------|------------|---------------------------|
| 1965 | 31,011,051 | 0 | 0 | 0 | 1,387,609 | 0 |
| 1966 | 28,922,678 | 561 | 51 | 42 | 15 | 44 |
| 1967 | 30,990,691 | 0 | 0 | 0 | 0 | 0 |

In short, the cumulative actions taken by the Mexican Government under which (1) refined lead is subject.to an export tax; (2) refined lead is sold domestically free of tax; (3) simple lead manufactures other than litharge are subject to export taxes, and (4) litharge is exempt from export taxes, have the necessary consequence of fostering and encouraging the exportation of litharge. Initially, the Mexican litharge manufacturer purchases his refined lead at a price that is nearly two cents below the international price of that commodity—this two-cent figure being composed of the export tax which is not paid by Mexican manufacturers. Thus, as earlier indicated, the litharge manufacturer in Mexico purchased refined lead for 8.6 cents per pound in July 1967 as compared to a world price of 10.44 cents per pound. In that same month the cost of refined lead in the United States was 14 cents per pound. After converting the refined lead into litharge, the litharge may be exported free of duty. Accordingly, the 2-cent per pound advantage received by the litharge producer upon his purchase of refined lead in Mexico still accompanies the litharge upon export since, unlike the case of other lead manufactures, it has not been offset by any comparable export tax on litharge. See Franklin Sugar Refining Co. v. United States, 142 F. 376, 380–381, 73 CCA 476 (E.D.Pa., 1906), aff'd 2 Ct.Cust. Appls. 116, T.D. 31659 (1911).

Against this background, we think it clear that the Mexican fiscal structure—which exempts from tax the domestic sale of refined lead and singles out litharge for exemption from any export tax—falls specifically within the criteria established by Nicholas & Co. v. United States, *supra*, 7 Ct.Cust.Appls. 97. For the facts that all refined lead is subject to a tax when sold domestically and that the litharge manufacturer who purchases such lead may, in contrast to other lead manufacturers, export his litharge duty free are concessions provided by the Mexican Government which "give * * aid or advantage to exporters of * * * [litharge] imported into this country." Nicholas & Co. v. United States, *supra*, 7 Ct.Cust.Appls. at 106. See also Nicholas & Co. v. United States, *supra*, 249 U.S. at 39, 39 S.Ct. 218. Indeed, when it is considered that Mexico taxes the exportation of all simple manufactures of

lead save litharge, the result of its fiscal system is no different in substance from what it would be if Mexico provided that *all* such manufactures of lead were to be subject to an export tax with the proviso that a refund equal to the amount of the export tax would be paid by the Mexican Government upon all exportations of litharge. See United States v. Hills Bros. Co., *supra*, 107 F. at 109. And it is immaterial that the Mexican fiscal system is based upon an exemption from tax rather than an appropriation of money out of the public treasury since the consequences are precisely the same. See Downs v. United States, *supra*, 113 F. at 147.

In the last analysis, the "sole inquiry" —as pointed out in Nicholas & Co. v. United States, *supra*, 7 Ct.Cust.Appls. at 107—is whether *the results* of the governmental acts "stimulate exportation * * * by affording aid from the public treasury whereby such goods may when exported be sold in competition with ours for less." The record here requires an affirmative response showing, as it does, that Mexican litharge is sold in the United States at a price well below that which can be quoted by domestic litharge producers in the United States. For example, in the summer of 1967, Mexican litharge was sold in the United States at approximately 14 cents per pound. On the same date, the domestic producer of litharge in the United States had to pay 14 cents per pound for refined lead, the primary raw material, and, thus, quoted a selling price for the fabricated product of about 16.5 cents per pound. This is not surprising since at the same time the domestic producer paid 14 cents for his refined lead, the Mexican producer, due to Mexican fiscal policy, was paying only 8.6 cents per pound and then exporting the litharge with an export tax exemption.

The record also shows that up to 1954 —when litharge was subject to export taxes—litharge imports into the United States from Mexico never reached one million pounds in any year.[18] In 1954, the year litharge was exempted from the export tax, imports from Mexico jumped to 1,171,100 pounds. And since 1954, the amount of litharge imports from Mexico has increased at a significant rate. In 1956, imports from Mexico were up to 10,741,672 pounds; by 1959, the total had jumped to 22,245,418 pounds; in 1962, the amount had increased to 30,633,745 pounds; and in 1967, Mexican imports of litharge amounted to 48,408,865 pounds. Imports of litharge from all countries in 1967 amounted to 49,264,739 pounds, thereby placing Mexico in the position in that year of being the source of over 98 percent of all litharge imports. These shipments are even more impressive when it is recognized that domestic litharge shipments in the United States in 1967 amounted to only 99,982 short tons, or 199,964,000 pounds. Thus, Mexican imports amounted to over 24 percent of total domestic shipments and comprised over 19 percent of the entire domestic market.

Nor is it coincidental that the large increase of Mexican litharge imports began in 1954 when Mexican litharge became exempt from export tax. Rather, there is a definite cause and effect relationship existing between the two events. First, the proximity of Mexico to the United States cannot account for the fact that Mexican imports amount to over 98 percent of total imports. Prior to 1954, Canada, with the same geographic advantage, generally exceeded Mexico in the amount of litharge exported to the United States.[19] Presently,

---

18. For each of the calendar years 1951 through 1953, exports from Mexico to the United States were as follows: In 1951, 600,590 pounds; in 1952, 221,050 pounds; and in 1953, 86,210 pounds.

19. For example, in 1951 Canadian exports of litharge to the United States amounted to 2,949,950 pounds as compared with 600,590 pounds from Mexico. In 1952, Canada exported 1,020,650

Canadian exports of litharge into the United States are inconsequential.[20] Second, the record shows that Mexican litharge is equal in commercial quality to domestically manufactured litharge. Third, Mexican imports are not fulfilling demands of consumers in the United States which domestic producers are unable to meet. In this connection, testimony at trial shows that there is idle capacity available in the domestic litharge industry. Fourth (as set out above), Mexican litharge is sold in the United States at a price well below that which can be quoted by domestic litharge producers. Fifth, the president of the largest litharge producer in Mexico (who was called as a witness by the party-in-interest) indicated that the removal of the export tax on litharge in 1954 had an important bearing on the increase of exports of litharge to the United States in subsequent years. Finally, this witness stated that the Mexican litharge producers had established a self-imposed quota on the amount of litharge which could be exported from Mexico to the United States, and that the purpose for this limitation on exports was to prevent the market in the United States from being upset. The fact of this self-imposed quota system makes certain conclusions inescapable. It demonstrates for one thing that the Mexican litharge industry is capable of acquiring a greater portion of the domestic market in the United States at any time, but is fearful of doing so. (Otherwise there would be no reason for the quota.) The cause of this fear can be only the possibility of remedial action taken in the United States to offset the non-competitive relationship which Mexican litharge bears to domestic litharge.

Party-in-interest argues that section 317(e) of the Tariff Act of 1922, now section 338(e) of the Tariff Act of 1930 (19 U.S.C. § 1338(e)), evidences that export duties are outside the scope of section 303 of the Tariff Act of 1930. We can not agree. Section 317(e) (presently section 338(e)) provides in part:

Whenever the President shall find as a fact that any foreign country imposes any unequal imposition or discrimination as aforesaid upon the commerce of the United States, or that any benefits accrue or are likely to accrue *to any industry in any foreign country by reason of any such imposition or discrimination imposed by any foreign country other than the foreign country in which such industry is located,* and whenever the President shall determine that any new or additional rate or rates of duty or any prohibition hereinbefore provided for do not effectively remove such imposition or discrimination and that any benefits from any such imposition or discrimination accrue or are likely to accrue to any industry in any foreign country, he shall, when he finds that the public interest will be served thereby, by proclamation specify and declare such new or additional rate or rates of duty * * *. [Emphasis added.]

■ Section 317(e) was directed primarily at a situation where colonies of colonial powers were furnishing raw materials to their mother countries at an advantage over third countries, by means of various forms of discrimination.[21] As a result, the Tariff Commission recommended that statutory authority be made available which would be aimed at offsetting such advantages.[22] Thus, sec-

---

pounds to the United States, while Mexico exported 221,050 pounds. In 1953, however, both countries exported only insubstantial amounts, with Canadian exports totaling 25,500 pounds, while Mexico exported 86,210 pounds.

20. In 1965, for example, Canadian exports to the United States aggregated only

49,200 pounds. In 1966 and 1967, there were no exports to the United States of Canadian litharge.

21. See U. S. Tariff Commission, Colonial Tariff Policies (1922).

22. U. S. Tariff Commission, Sixth Annual Report (1922), p. 6.

tion 317(e) allows the President to impose additional or new duties on imports of countries which receive benefits from another country resulting from that country's discrimination against the United States. The section, in particular, provides for additional duties when an industry in a foreign country receives an advantage imposed *"by any foreign country other than the foreign country in which such industry is located."* Section 303, on the other hand, calls for a countervailing duty whenever a country bestows a bounty or grant upon the production or export of *"any article or merchandise manufactured or produced in such country * * *."* Therefore, section 317(e) was enacted not because export duties were outside the scope of section 303, as plaintiff contends, but because the advantage colonial powers were receiving in regard to raw materials could not be remedied under section 303 inasmuch as the advantage originated in a country other than the country of production, and thus was outside the procedural criteria of section 303.

The protest is sustained. Judgment will be entered directing the district director of customs at Laredo, Texas, to reliquidate the entry by adding an additional duty equal to the amount, as found by the Secretary of the Treasury, of the bounty or grant bestowed by the Mexican Government upon the exportation of litharge.