**ASG INDUSTRIES, INC., PPG Industries, Inc., Libbey-Owens-Ford Company, and C E Glass**

v.

**UNITED STATES.**

**C.D. 4788; Court No. 76–3–00642.**

United States Customs Court.

Feb. 6, 1979.

---

4. Current Industrial Reports MQ–32A for the years 1972–1975: items designated 3211213 and 3211215.

Stewart & Ikenson, Washington, D. C. (Eugene L. Stewart and Frederick L. Ikenson, Washington, D. C., of counsel), for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Chief, Customs Section, New York City, Joseph I. Liebman, John J. Mahon and Sidney N. Weiss, Trial Attys., New York City, for defendant.

Pilkington Brothers, Limited, amicus curiae (Charles W. Smith, Atty.; Morgan, Lewis & Bockius, Washington, D. C., of counsel), as amicus curiae.

LANDIS, Judge:

 This case raises the question of whether various forms of government financed regional development programs instituted by Great Britain come within the provisions of section 303(a) of the Tariff Act of 1930, as amended by section 331(a) of the Trade Act of 1974.[1] The statute provides:

> (1) Whenever any country * * * shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country * * * then upon the importation of such article or merchandise into the United States * * there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed * * * a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

It is the holding of this Court that these programs do not come within the purview of the statute.

This case comes here by motion and cross-motion for summary judgment pursuant to rules 4.12 and 8.2 of this Court. The facts are undisputed as they relate to the decision.

Plaintiffs,[2] who are domestic manufacturers and wholesalers of float glass, informed the Commissioner of Customs by petition, pursuant to section 303(a) of the Tariff Act of 1930, as amended *supra,* that certain bounties or grants were being paid upon the manufacture or production of float glass in the United Kingdom or upon exportation. The Department of the Treasury conducted an investigation and published in 1975 a "Notice of Preliminary Countervailing Duty Determination" in the Federal Register, in part as follows (40 Fed.Reg. 27499):

> British Government officials have advised the Treasury Department that the regional development programs have the effect of offsetting disadvantages which would discourage industry from moving to and expanding in less prosperous regions. They have produced evidence that assistance given is available to all industries within the regional development ar-

---

1. 88 Stat. 1978, 2049 (1975), 19 U.S.C. § 1303(a) (Supp. V 1975).

2. The plaintiffs are:

ASG Industries, Inc.
PPG Industries, Inc.
Libbey-Owens-Ford Company
C E Glass

eas and is in no way conditioned upon exports. Based on 1974 production figures for U.K. float glass, 26 percent of all such production was exported, and a small percentage of this amount was exported to the United States. The amount of assistance provided by the regional incentive programs was less than 1 percent of the value of the float glass sold. It was concluded by the Department of the Treasury that no bounty or grant was being paid.

Thereafter a notice of "Final Countervailing Duty Determination" was published in the Federal Register, in part as follows (40 Fed.Reg. 59227):

> After consideration of all information received, a final determination is hereby made, that, for the reasons stated in the preliminary determination, no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303, Tariff Act of 1930, as amended (19 U.S.C. 1303), upon the manufacture, production or exportation of float glass from the United Kingdom.

Subsequently, in 1977 an "Amendment of Notice of Preliminary Countervailing Duty Determination" was published in the Federal Register, in part as follows (42 Fed.Reg. 20525):

> The information obtained during the investigation conducted was recently reviewed and it is deemed appropriate, for the purposes of accuracy, to correct the last sentence of paragraph three of the preliminary determination to read as follows:

> The amount of assistance provided by the regional incentive programs was slightly over 1 percent of the value [the exact amount is less than two percent, but is not stated in order to protect confidential commercial information] of the float glass sold.

> This correction in no way affects the final negative countervailing duty determination issued previously in this case.

Plaintiffs, pursuant to section 516(d) of the Tariff Act of 1930, as amended by section 321(f) of the Trade Act of 1974,[3] served notice of intention to contest the negative determination and filed summons in this Court.

The facts surrounding the alleged bounties or grants in this case are deemed to be material and will now be discussed.

The benefits were received by Pilkington Brothers, Limited (hereinafter referred to as "P.B.L."),[4] the only float glass producer in the United Kingdom. P.B.L., in one name or another, had since the year 1826 manufactured a variety of glass products.

Between the late 1950's and the early 1970's, P.B.L. constructed four float glass "lines" or plants to replace the facilities used previously. The production plants all were located at St. Helens, County of Merseyside, a depressed economic area, designated as a "Development Area" so as to qualify for regional economic assistance. The area was later designated as a "Special Development Area" and Great Britain paid as much as 22 percent of the cost of the buildings, plant and machinery and the repair thereon and during the years from

---

**3.** (d) Contest of Secretary's determination that foreign merchandise is not being sold in United States at less than fair value or that bounty or grant is not being paid.

Within 30 days after a determination by the Secretary—

(1) under section 160 of this title, that a class or kind of foreign merchandise is not being, nor likely to be, sold in the United States at less than its fair value, or

(2) under section 1303 of this title, that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's, or wholesaler's desire to contest the determination. Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination. [88 Stat. 1978, 2048 (1975), 19 U.S.C. § 1516(d) (Supp. V 1975).]

**4.** P.B.L. filed a brief as *amicus curiae*.

1967 to 1974 had expended a total of approximately five million pounds thereon.

The various reasons for the extending of government assistance were generally political, policymaking and economic in nature and are too numerous to mention in detail, but in none of them was eligibility conditioned upon the amount of exportation. In all of P.B.L.'s production for 1974, approximately 26 percent was exported and only a small percentage of this amount was exported to the United States. The amount of assistance provided by the government programs was between one and two percent of the value of the float glass sold. Both parties concur that the amount of benefit was more than *de minimis*. All the grants were cash payments.[5]

▮ Plaintiffs contend, in the light of *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903) and *Nicholas & Co. v. United States,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 541 (1919), that any aid received by a foreign manufacturer, in more than *de minimis* amounts, is a bounty or grant for purposes of section 303(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303(a). Defendant, on the other hand, cites the statute as to the presumption of correctness[6] and traces the history of bounties and grants in a number of European nations. Defendant argues that the legislative history of the countervailing duty statute demonstrates that only those programs which distort international trade (or promote exports) were intended to be reached by the statute and that Congress left for the Secretary of the Treasury the determination as to which programs constituted a bounty or grant within the meaning of the Act.

As stated by the Court of Customs and Patent Appeals in *United States v. Hammond Lead Products, Inc.,* 440 F.2d 1024, 58 CCPA 129, 137, C.A.D. 1017 (1971), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971): " * * * In the as-

sessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative, or policy spheres."

These judgments have been left to the Secretary, and as the Court further states at page 139: "There can be no doubt that the Secretary is under a legal duty to assess countervailing duties if he sees a bounty or grant being paid, and we think he does and must exercise some discretion in defining what acts of foreign governments confer bounties or grants, when the case is doubtful."

Also, as was stated by the Court of Customs and Patent Appeals in *United States v. Zenith Radio Corporation,* 64 CCPA 130, at pp. 138–39, C.A.D. 1195 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978):

* * * Congress' intent to provide a wide latitude, within which the Secretary of the Treasury (Secretary) may determine the existence or non-existence of a bounty or a grant, is clear from the statute itself, and from the congressional refusal to define the words "bounty," "grant," or "net amount," in the statute or anywhere else, for almost 80 years. As affects the present case, and consistent with that broad intent, Congress has not statutorily required that every governmental action distinguishing between products consumed at home and those exported shall be deemed the bestowing of a bounty or grant.

* * * * * *

Neither form nor nomenclature being decisive in determining whether a bounty or grant has been conferred, it is the *economic* result of the foreign government's action which controls. Thus, the language of § 303, "[w]henever any country * * * shall pay or bestow * * any bounty or grant," requires a factual inquiry. The statute assigns that factual

---

5. At a preliminary hearing on or about February 15, 1977, the Court considered the contentions of the parties and entered appropriate orders.

6. In any matter in the Customs Court:

 (a) The decision of the Secretary of the Treasury, or his delegate, is presumed to be correct. * * * [84 Stat. 280, 28 U.S.C. § 2635.]

inquiry, in the first instance, to the Secretary. Courts may review a factual record upon which a determination has been based, but are woefully ill-equipped to undertake unaided the complex economic analyses required to determine whether a bounty or grant has in fact been conferred as a result of a particular governmental action. * * * [Emphasis supplied.]

And as stated by the Supreme Court in *Zenith v. United States* (p. 458 of 437 U.S., p. 2449 of 98 S.Ct.):

Aside from the contention, discussed in Part III, *infra,* that the Department's construction is inconsistent with this Court's decisions, petitioner's sole argument is that the Department's position is premised on false economic assumptions that should be rejected by the courts. In particular, petitioner points to "modern" economic theory suggesting that remission of indirect taxes may create an incentive to export in some circumstances, and to recent criticism of the GATT rules as favoring producers in countries that rely more heavily on indirect than on direct taxes.[14] But even assuming that

[14] See, *e. g.*, Marks & Malmgren, Negotiating Nontariff Distortions to Trade, 7 L. & Policy in Int'l Bus. 327, 351–355 (1975); The United States Submission on Border Tax Adjustments to Working Party No. 4 of the Council on Border Tax Adjustments, Organization for Economic Cooperation and Development (1966), reprinted in App. 93–116; Paper Submitted by John R. Petty, Assn't Sec'y of the Treasury, Twenty-First Annual Conference of the Canadian Tax Foundation (1968), reprinted in App. 117–138. Both the Secretary and GATT apparently consider remissions of direct taxes (*e. g.*, income taxes) to be countervailable export subsidies. See Brief for the United States 18 n. 10, 37–38; GATT, Basic Instruments and Selected Documents, 9th Supp., at 186–187 (1961).

these arguments are at all relevant in view of the legislative history of the 1897 provision and the long-standing administrative construction of the statute, they do not demonstrate the unreasonableness of the Secretary's current position. Even "modern" economists do not agree on the ultimate economic effect of remitting indirect taxes, and—given the present state of economic knowledge—it may be difficult, if not impossible, to measure the precise effect in any particular case. See, *e. g.*, Executive Branch GATT Studies, *supra,* at 13–14, 17; Marks & Malmgren, *supra,* n. 14, at 351. More fundamentally, as the Senate Committee with responsibility in this area recently stated, "the issues involved in applying the countervailing duty law are complex, and . . internationally, there is [a] lack of any satisfactory agreement on what constitutes a fair, as opposed to an 'unfair,' subsidy." S.Rep. No. 93–1298, p. 183 (1974). In this situation, it is not the task of the judiciary to substitute its views as to fairness and economic effect for those of the Secretary.

The facts in *Zenith, supra,* were that Japan imposed a commodity tax on electronic products when they were sold in that country but remitted the tax for those products which were exported. The issue was whether Japan conferred a "bounty" or "grant" on certain consumer electronic products by failing to impose the commodity tax on those products when they were exported.

The Court concluded the determination made by the Secretary of the Treasury was reasonable in holding that the nonexcessive Japanese tax was not a "bounty" or "grant" within section 303(a) of the Tariff Act of 1930, as amended, and should not be countervailed.

In supplemental briefs filed here the parties have debated the relevance of *Zenith.* The Supreme Court's opinion certainly is not on all fours with the instant litigation. In *Zenith,* a tax remission was involved. Here, we have cash subsidies given for certain "underdeveloped" areas. Nevertheless, the approach of *Zenith* and the general thrust do have significant relevance for the case at bar.

In the *Zenith* case, the Supreme Court stated (p. 450 of 437 U.S., p. 2445 of 98 S.Ct.):

The question is thus whether, in light of the normal aids to statutory construction, the Department's interpretation is

"sufficiently reasonable" to be accepted by a reviewing court. *Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). * * *

In the instant case, there is no question but that the government's interpretation is "sufficiently reasonable."

In view of the legislative intent, the presumption of correctness, the reasonableness of the Secretary's decision, and the thrust of *Zenith,* it is the holding of this Court that the programs of Great Britain do not come within the purview of section 303(a) of the Tariff Act of 1930, as amended.[7]

In light of the result reached, the Court has not discussed all the arguments of the parties.

For all these reasons, plaintiffs' motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. Judgment will be entered accordingly.

---

7. The recent decision of Judge Ford of this Court, C.D. 4782, decided January 5, 1979, *appeal pending,* is noted.